**UNITED STATES of America, Appellee,**

v.

**Joseph NATALE and Frank Russo, Appellants.**

**Nos. 307, 308, Dockets 75–1276, 75–1298.**

United States Court of Appeals, Second Circuit.

Argued Oct. 6, 1975.

Decided Nov. 28, 1975.

Certiorari Denied April 26, 1976.

See 96 S.Ct. 1724.

---

Ronald M. Kleinberg, New York City, for appellant Natale.

William Sonenshine, Evseroff & Sunenshine, Brooklyn, N.Y., for appellant Russo.

Steven K. Frankel, Sp. Atty., U.S. Dept. of Justice (Paul J. Curran, U.S. Atty., S.D.N.Y., John D. Gordan, III, Asst. U.S. Atty., of counsel), for appellee.

Before WATERMAN, OAKES and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

This criminal appeal involves a number of trial court rulings but no question of sufficiency of the evidence of applicability of the statute. Joseph Natale and Frank Russo appeal from judgments of conviction entered on May 15, 1975, after a jury trial in the Southern District of New York before Judge Lloyd F. Mac-Mahon. They were tried, along with a codefendant, John Conti, under a three count indictment which charged them with a conspiracy to collect extensions of credit by extortionate means, with the substantive crime of using such means to collect such extensions, 18 U.S.C. §§ 2 and 894,[1] and with an attempt to obstruct commerce by extortion, in violation of 18 U.S.C. § 1951.[2] The jury

---

1. 18 U.S.C. § 894(a) provides:

Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the non-repayment thereof,

shall be fined not more than $10,000 or imprisoned not more than 20 years, or both. The phrase "extortionate means" is defined to include "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7).

2. 18 U.S.C. § 1951(a) provides:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

found appellants Natale and Russo guilty on the extortionate collection counts, but not guilty on the obstructing commerce count. Defendant Conti was acquitted on all counts. Judge MacMahon sentenced the appellants to concurrent terms of five years' imprisonment on each guilty count. We affirm.

■ The heart of the crime for which Natale and Russo have been convicted is the use, or threatened use, of force or violence to a person, his reputation or his property, as a means of collecting money lent. See 18 U.S.C. § 891(7). The transactions which come under the purview of this statute are normally usurious and, therefore, are unenforceable in courts of law.[3] It is the effort of usurious money lenders, or "loan sharks," to seek extralegal methods of enforcing their unconscionable agreements which this statute is designed to restrain.[4] And it is just such efforts which have been proved at trial in this case.

Frank Russo had a neighbor, Peter Amato, who, during 1974 and the first part of 1975, worked as the bookkeeper for Barbara Creations, Inc., a Manhattan manufacturer of bridal veils. Barbara Creations was having cash flow problems late in 1974 and Amato evidently proposed to its owner, Murray Weiss, that Amato loan a sum to the corporation to assist it in its financial straits. Weiss agreed to accept temporary loans from Amato of $7,000 on December 3, 1974, $3,000 on January 24, 1975, and $5,000 on January 31, 1975.

Apparently unbeknownst to Weiss, the source of these funds was not really Amato, but was Joseph Natale and Frank Russo. Amato had contacted his neighbor Russo, from whom he had previously borrowed at usurious rates, in November of 1974, and informed him that if Russo could loan him a substantial sum of money he would be able to use it to solidify his position at Barbara Creations. Apparently Amato led Russo to believe that Amato held an ownership interest in the company. Russo told Amato to meet with him and Frank Natale in Russo's office at 1430 Broadway in New York to discuss a possible loan. At their meeting, Amato provided Natale and Russo and their attorney, Harris Lapin, with information concerning Barbara Creations and its officers. On December 3, 1974, Russo and Natale gave Amato $10,000 in cash, with the understanding that a weekly payment of $300 interest ("vigorish") would be due until the principal was repaid in full. On the basis that no collateral had been provided to secure the loan, Russo asked Amato to leave $3,000 of the amount lent with him, as a "token" for the favor of the loan. Amato agreed and deposited the remaining $7,000 in the Barbara Creations bank account. Three hundred dollars per week on a net $7,000 loan approximates 222 per cent interest per annum, even without compounding.

On January 22, 1975, Amato again contacted Russo with a request to borrow funds for Barbara Creations. He told Russo that the corporation was overdrawn at the bank and needed money to cover the checks it was writing.[5]

3. Usurious loans are illegal under New York law, N.Y. Penal Law § 190.40 (McKinney 1975), and usurious contracts are unenforceable, N.Y. Gen.Obl.Law § 5–511 (McKinney 1975).

4. The question of the constitutionality of this federal regulation of intrastate "loan-sharking" has been previously decided affirmatively by this court in United States v. Manarite, 434 F.2d 1069 (2d Cir. 1970), cert. denied, 402 U.S. 972, 91 S.Ct. 1657, 29 L.Ed.2d 136 (1971), and in United States v. Perez, 426 F.2d 1073 (2d Cir. 1970), aff'd, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). Perez was affirmed by

the Supreme Court on the basis that Congress's finding that local loan-sharking has a substantially adverse effect on interstate commerce indicated that the legislation is rationally in furtherance of Congress's Article I authority over commerce.

5. One factor contributing to Barbara Creations' chronic cash flow problems was the extraordinary fact, admitted by Amato, that he was padding the payroll and taking money out of the corporation's petty cash account. He extracted approximately $12,000 out of the firm before his activities were discovered by the president, Weiss, on February 8, 1975, at

Russo agreed to loan Amato $3,000, with the understanding that repayment in the amount of $4,000 was to be made in three weeks. Amato repaid this loan a few weeks later with money provided by Barbara Creations' president, Weiss.

On January 31, 1975, the corporation's account again became overdrawn, and Amato, once again flirting with the loan sharks' jaws, sought a loan of $5,000 from appellants. He met with them in Russo's office that day. Amato was given the $5,000, but with instruction to pay back $6,500 no later than February 6, 1975. It was the failure to repay this loan, as well as delay in repayment of a portion of the December, 1974, advance, which led to the offense charged in this case.

When Amato began to fall behind on his payments, he was given a series of extensions which culminated in a deadline of 10:00 a. m. on February 11. On the morning of the 11th Russo met his neighbor Amato as he was leaving his home. He was friendly enough to tell Amato that he had better come up with the money by 10:00 a. m. or that Natale "will just waste you, and not worry about the money at all." Amato decided to report this threat to the police. An officer was assigned to the case, and the officer and Amato went to Russo's office in Manhattan. The officer posed as a friend of Amato's who was trying to help him raise money to repay the loan. While the officer was there, and in Russo's presence Natale told Amato that if he kept "giving me this kind of story about not paying me back . . . then the money won't matter. I will just kill you."

The next day, Russo called Amato on the telephone at work and threatened to take Weiss' car and Amato's house if the loan wasn't repaid immediately. On the 14th, Amato had obtained $3,000 to repay part of his loan and took it to Russo's office. When he arrived Natale and John Conti were waiting along with Rus-

so. Amato paid over the money which was handed by Russo and Natale to Conti. Later that day, Russo told his neighbor Amato that Conti was a "hit man . . . there to size you up" in case Amato hadn't paid.

The final chapter in this saga occurred on February 19, 1975. Russo and Natale went to the offices at Barbara Creations to meet with Weiss and Amato. At this meeting, Weiss informed the appellants that Amato had no ownership interest in Barbara Creations, that he had been stealing from the company, that Weiss was not responsible for any of Amato's debts and accordingly would not pay them anything. Apparently this was a surprise to Russo, for later that day he went to Amato's home and told him, "What's it going to be?—you lied and now you are in trouble and to put you in their good eyes is going to cost you $5,000 extra for lying to them, stringing them along all this time." Amato testified that "Russo said to me if I did not come up with this money that Joey will come into my house, do a job on my wife and children in front of me, while I watched."

For the above series of events, Russo and Natale were convicted of the use of extortionate means to collect extensions of credit. On this appeal they urge seven separate grounds for reversal of their conviction.

I. *Charge to the Jury on the Elements of the Offense.* The judge at trial instructed the jury that there are three separate elements of the § 894 substantive offense charged in this case. The Government must prove (1) that there was principal or interest outstanding on the loans, (2) that the defendants actually collected or attempted to collect sums due, and (3) that the defendants employed extortionate means to collect same. Judge MacMahon stated that, as to the first two elements of the offense, "I don't think there is any dispute in the evidence. . . ." Appellants claim

---

which time Amato was fired. Thus we have the rather bizarre spectacle of a fellow bor-

rowing money at usurious rates to lend it to a corporation from which he was stealing.

that this charge amounted to a directed verdict on those two elements of the offense and that they are entitled, therefore, to a new trial.

 Cases such as *United States v. Howard,* 506 F.2d 1131 (2d Cir. 1974), and *United States v. Fields,* 466 F.2d 119 (2d Cir. 1972), have reestablished that failure to charge each separate element of an offense may be plain error. Such "errors go directly to a defendant's right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are." *United States v. Fields, supra,* 466 F.2d at 121. Failure to charge each element of the offense may be reversible error even where the elements not charged have been wholly uncontested by the defendant. *United States v. Howard, supra,* 506 F.2d at 1134. The plea of not guilty places every issue in doubt, and not even undisputed fact may be removed from the jury's consideration, either by direction or by omission in the charge. *See United Brotherhood of Carpenters and Joiners of America v. United States,* 330 U.S. 395, 408, 67 S.Ct. 775, 91 L.Ed. 973 (1947); *Roe v. United States,* 287 F.2d 435, 440 (5th Cir.), *cert. denied,* 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961). *But cf. United States v. Pravato,* 505 F.2d 703 (2d Cir. 1974) (court's inadvertent and erroneous statement that stipulation covered one element not plain error where all elements charged and no objection as matter of trial strategy).

In this case, however, the trial judge did charge each element of the offense. His indication that he did not "think"

there was any dispute in the evidence as to the first two elements of the offense fell far short of an actual direction to the jury that these essential facts had been proven beyond a reasonable doubt. A trial judge is permitted to comment upon the evidence if he does so fairly and makes clear to the jury that all matters of fact are submitted for their determination. *See, e. g., Horning v. District of Columbia,* 254 U.S. 135, 138, 41 S.Ct. 53, 65 L.Ed. 185 (1920) (Holmes, *J.*); *Gant v. United States,* 506 F.2d 518, 520 (8th Cir. 1974), *cert. denied,* 420 U.S. 1005, 95 S.Ct. 1449, 43 L.Ed.2d 764 (1975); *United States v. Tourine,* 428 F.2d 865, 869 (2d Cir. 1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971). When commenting on the evidence Judge MacMahon gave the standard or pattern instructions that the jurors were the sole judges of facts and not bound by his opinions, informing the jury that it alone was to decide the weight, effect and value of the evidence and that the court had no opinions on the evidence.[6] *See Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); *United States v. DeLaMotte,* 434 F.2d 289, 292 (2d Cir. 1970), *cert. denied,* 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). The judge's expressed opinion as to the absence of dispute over the first two elements of the offense was not in any sense unfair. The evidence that a debt existed and that efforts at collection had been made was, in fact, not disputed by the defense.[7] Rather, their position at trial was that the financial transactions involved here were wholly amicable and legitimate.[8] Since the trial court's com-

---

6. Additional statements to the same effect were made at least twice more in the judge's instructions to the jury.

7. It should be noted that Judge MacMahon did not charge that there was uncontradicted evidence on the elements of the offense which "as a matter of law" foreclosed jury deliberations on the issues. *See United States v. Gollin,* 166 F.2d 123, 125 (3d Cir.), *cert. denied,* 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151 (1948). Rather, the judge suggested that he did not "think" the evidence adduced by both

parties was "in dispute" as to two of the elements. This is not tantamount to a direction that the evidence "not in dispute" proves the elements of the offense beyond a reasonable doubt.

8. Appellants argue that they had informed Weiss, after their meeting with him in his office on February 18, 1975, that he was not legally liable on the loans they had made Amato. They suggest in their briefs that the jury might have concluded that this was also their posture toward Amato. But it does not follow

ment, in its context, was fair, and since the jury's role as finder of facts was repeatedly and accurately explained by the trial court, we find no error in the challenged instructions. *Cf. United States v. Pravato, supra.*

More troublesome is appellant Natale's contention that the trial court's charge to the jury was inadequate because it failed to require the jury to find that the threats employed by Russo and Natale had actually placed Weiss or Amato in fear of harm. The judge charged the jury that the Government must prove from the evidence that "an ordinary person would have been put in fear of immediate bodily harm or future bodily harm from anything that the defendant said or did to Weiss or Amato . . . ." It is true that this charge did not require the jury to find that the persons threatened had actually been placed in fear, but it is the threat of harm which is prohibited by 18 U.S.C. § 894, and actual fear is not an element of the offense. *But see United States v. Biondo,* 483 F.2d 635, 643 (8th Cir. 1973), *cert. denied,* 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974) (since "victim's state of mind is an essential element of the crime charged," 18 U.S.C. § 1951, hearsay evidence regarding state of mind admissible). To be convicted, the defendant must have intended to make a "threat of use, of violence or other criminal means, to cause harm to the person, reputation, or property of [another] person." 18 U.S.C. §§ 891(7). Convictions have been sustained under this statute even where the person threatened has

denied at trial that he was put in fear by the threat. *United States v. DeLutro,* 435 F.2d 255 (2d. Cir. 1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148 (1971). The approach chosen by the trial judge, to define the word "threat" in the statute by reference to the reasonable apprehensions of an "ordinary person," gives the statute a proper construction since it focuses the jury's attention on the evil being attacked—the defendant's conduct. Acts or statements constitute a threat under 18 U.S.C. § 891(7) "if they instill fear in the person to whom they are directed *or are reasonably calculated to do so in light of the surrounding circumstances . . . ." United States v. Curcio,* 310 F.Supp. 351, 357 (D.Conn.1970) (Timbers, *J.*) (emphasis added). It is this "calculated" use of threatening gestures or words to collect credit extensions which Congress has made criminal. Actual fear need not be generated, so long as the defendants intended to take actions which reasonably would induce fear in an ordinary person.[9] In other words, it is the conduct of the defendant, not the victim's individual state of mind, to which the thrust of the statute is directed. We have no doubt that Congress meant to protect not only the weak and timid from extortionate threats, but the strong and intrepid as well. *See United States v. Alsop,* 479 F.2d 65, 67 (9th Cir. 1973); *United States v. Epps,* 438 F.2d 1192 (4th Cir. 1971). *See also United States v. Brown,* 412 F.2d 381, 384 (8th Cir. 1969). Accordingly, we reject the claim that actual fear is a necessary element of this offense.[10]

that because appellants felt Weiss was not obligated on Amato's debt, they also felt Amato owed them nothing. There is no evidence of a willingness to forgive the debt. In fact, the evidence of their belief that Amato remained indebted to them is not disputed in the trial record.

**9.** We should also observe that the appellants failed to make timely objection to the instructions pursuant to Fed.R.Civ.P. 30. They cannot, therefore, object to any mistakes in the charge which are not "plain error." In light of our holding that the instructions given were proper, we need not consider this alternative

ground for affirming the judgment. We should note, however, that at least once in the charge the judge instructed the jury that it must find that the threats did arouse or were intended to arouse fear in Amato or Weiss. *See* note 11 *infra.* Thus, any error in the charge was at least partially moderated in its total context.

**10.** Appellants' argument on this point under 18 U.S.C. § 894 was somewhat confused. They cited to us the requirement that actual fear be shown to have existed in convictions under 18 U.S.C. § 892 for "making extortionate extensions of credit." In prosecutions under that

II. *Charge to the Jury on Intent and Entrapment.* Appellants argue that the portions of Judge MacMahon's charge to the jury which dealt with criminal intent and entrapment were prejudicial. The appellants' first claim is that the judge's comments on the matter of intent to threaten use of force were too one-sided and indicated a conviction on the judge's part that the appellants were guilty. While impartiality is, of course, required in the judge's summation, *Quercia v. United States, supra,* 289 U.S. at 470, 53 S.Ct. 698, he has discretion to choose which facts he will mention in his comments, so long as the overall thrust of the charge is fair to both sides. *E. g., United States v. Tourine, supra,* 428 F.2d at 869. Judge MacMahon noted that the jury should consider, in determining whether a conspiracy to use extortionate means existed, "whether [the persons involved] kept the usual business records of checks, etc., or whether they dealt in large sums of cash and currency." But these are perfectly proper comments which do not, on their face, amount to the sort of repetitious, one-sided summary that unfairly prejudices the defendants and requires a new trial. This short comment on the evidence was given in the context of instructions which carefully protected the jury's independent right to evaluate the entire case, and we find that appellants were not prejudiced by it. *Compare United States v. Tramunti,* 513 F.2d 1087, 1119–20 (2d Cir. 1975), *cert. denied,* 423 U.S. 882, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), *with Boatright v. United States,* 105 F.2d 737, 739 (8th Cir. 1939).[11]

In the course of instructing the jury, the trial judge informed them that the defense of entrapment is not available where the defendants have the intention, readiness and willingness to commit the crime. The appellants claim that this was a gratuitous side reference which indicated the judge's belief in their guilt. In fact, however, a short explanation of that defense, and its applicability to this case, was made necessary by defense counsel's closing argument which had suggested that Amato had tried to "entrap" Russo and Natale to protect himself from embezzling charges. In this situation it was entirely appropriate for Judge MacMahon to have provided a brief explanation of the nature of the defense to assure that the jury was not sidetracked by matters wholly undeveloped in the record and a defense never really asserted.

III. *Trial Court's Intervention at Trial.* In several instances the trial judge intervened in the conduct of the trial to ask questions of various witnesses. We have time and again cautioned that the judge should be careful to preserve an attitude of impartiality and guard against communicating to the jury any impression that the court is of the opinion that the defendant is guilty. *E. g., United States v. Nazzaro,* 472 F.2d 302 (2d Cir. 1973). Our review of the

---

statute, unlike those under § 894, the Government must show a prior "understanding of the creditor and debtor . . . that delay in making repayment . . . could result in the use of violence . . . to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(6). Since this understanding will exist only where the debtor fears that the threat of force is genuine, the state of mind of the victim would appear an essential element of that offense to be proved by the Government. *See United States v. DeCarlo,* 458 F.2d 358, 367 n. 12 (2d Cir.), *cert. denied,* 409 U.S. 843, 93 S.Ct. 107, 34 L.Ed.2d 83 (1972).

11. The charge given by Judge MacMahon on the subject of the defendants' intent to use extortionate means was as follows:

[T]he essential question for you is whether the defendant knowingly and intentionally aroused or instilled or attempted to arouse or instill a reasonable fear of bodily harm or economic loss in Weiss or Amato by creating a menacing atmosphere of intimidation and threats. It is not necessary for the victim to become terrified, panic stricken, hysterical or show the least sign of fright.

The appellants claim that the instruction is insufficient because actual fear must have been proven as part of this offense. In light of our discussion above, we cannot accept that view.

record convinces us that Judge Mac-Mahon was doing no more than asking such questions as would serve the ends of justice by assisting the jury in understanding the evidence. *United States v. Cuevas,* 510 F.2d 848, 850 (2d Cir. 1975); *United States v. Boatner,* 478 F.2d 737, 740 (2d Cir.), *cert. denied,* 414 U.S. 848, 94 S.Ct. 136, 38 L.Ed.2d 96 (1973); *United States v. Pellegrino,* 470 F.2d 1205, 1206–07 (2d Cir. 1972), *cert. denied,* 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973).

The complaint of excessive intervention by the trial judge is focused on the examination of Harris Lapin, the chief defense witness and attorney who assisted Russo and Natale at their February 19, 1975, meeting with Weiss and Amato.[12] Lapin was being cross-examined regarding Amato's ability to provide collateral for the loans, when the trial judge asked two questions about whether Lapin knew what the terms of the loans were to be. He also asked Lapin whether he knew that the loan arrangement was usurious,[13] and therefore that any collateral arrangement would be unenforceable. The appellants contend that this "hostile" line of questioning was intended to ridicule their witness and to discredit their defense that their relations with Amato were conducted as normal business transactions. It is obvious from the record, however, that the court's questions were intended to assist the jury in its evaluation of the nature of the transactions in this case. This limited interjection by the trial judge was well within his active responsibility to assure that the issues were clearly presented to the jury. *See United States v. Brandt,* 196 F.2d 653, 655 (2d Cir. 1952). A reading of the examination of witness Lapin *in toto* establishes that the claim of prejudice cannot be sustained; we therefore reject appellants' claim of error. *See United States v. Newman,* 481 F.2d 222, 224 (2d Cir. 1973) (per curiam).

IV. *Refusal to Produce Grand Jury Testimony of Witness Lapin.* Appellants claim that the trial court erred in refusing to require the Government to produce the grand jury testimony of the witness Lapin prior to his being called as a defense witness. The contention is that this constituted a suppression of exculpatory evidence in violation of the rule of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (suppression by prosecution of evidence favorable to accused upon request violates due process where evidence is material, irrespective of good or bad faith of prosecution). The gloss which appellants would have us read upon *Brady* is that the prosecution must provide evidence favorable to the defense which is given by a witness before the grand jury even though the witness is one who testifies at trial for the defense.[14] This we decline to do.

"The heart of the holding in *Brady* is the prosecution's suppression of evidence" favorable to the accused. *Moore v. Illinois,* 408 U.S. 786, 794, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972). The concept of "suppression" implies that the Government has information in its pos-

---

12. In that meeting Lapin advised Russo and Natale that Weiss and Barbara Creations were not obligated to repay to the appellants any sums which Amato had borrowed, even though Amato had lent the money in turn to the corporation.

13. The transaction then being discussed was a loan of $5,000 with repayment of $6,500 one week later. Even without compounding of interest, this indicates an interest rate of over 1500 per cent per year. On redirect Lapin denied knowing the duration of the loan, but the amount of the interest apparently did not trouble him or raise any questions in his mind,

and this is what the judge's questions concerned.

14. The appellants, of course, have no right to obtain Harris Lapin's grand jury testimony under the Jencks Act, since Lapin was not a "Government witness or prospective Government witness . . . ." 18 U.S.C. § 3500(a). *See generally United States v. Dioguardi,* 428 F.2d 1033 (2d Cir.), *cert. denied,* 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970). Lapin was called as a witness by, and his testimony was favorable to, the defense.

session of which the defendant lacks knowledge and which the defendant would benefit from knowing. *See Giles v. Maryland,* 386 U.S. 66, 96, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (White, J., concurring). Here, as in *United States v. Ruggiero,* 472 F.2d 599, 604 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973), this essential prerequisite to invocation of the *Brady* rule is lacking. There was no "suppression" involved in the Government's turning over Lapin's grand jury testimony to the trial court for his decision on the disclosure motion. Nor were the appellants lacking access to the information which they sought to obtain from the grand jury minutes. Lapin, who had represented both of them, was continually available for interviewing, or, had he proved suddenly uncooperative, for subpoena.[15] In fact, Lapin appears to have cooperated fully throughout the trial with them. They have failed to advance any plausible suggestion of prejudice to them from the judge's ruling, so that we conclude that there has been no suppression whatsoever of any favorable evidence in this case. *See United States v. Ruggiero, supra,* 472 F.2d at 604–05.

■■■■ V. *Examination of Witness Lapin by the Prosecutor.* Appellants claim that the prosecutor improperly discredited the testimony of witness Lapin by asking, on cross-examination, whether Lapin recalled "testifying before a grand jury under immunity on the 13th of March of this year." This is said to have ineluctably led the jury to the conclusion that the witness's credibility was suspect because grand jury testimony had to be forced out of him over a claim of Fifth Amendment privilege.

Where a prosecutor directly asks a defense witness at trial whether the wit-

ness refused to answer questions at the grand jury proceedings because the answers might have tended to incriminate him, courts have found prejudicial error and reversed the convictions. *See, e. g., United States v. Williams,* 464 F.2d 927 (8th Cir. 1972); *cf. United States v. Glasser,* 443 F.2d 994, 1005 (2d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971). Such direct efforts to impeach a defense witness are improper under *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), where the Supreme Court reversed a conviction because the prosecutor had improperly cross-examined a defendant as to the assertion of his Fifth Amendment privilege before a grand jury. The salutary ruling of *Grunewald* was based on that view that the question prejudiced the credibility of the defendant without sufficiently bearing on the truth of the testimony he had given at trial. *Id.* at 423–24, 77 S.Ct. 963. Mr. Justice Black's concurrence in *Grunewald* took an even harsher stance toward such questioning: "I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it." *Id.* at 425, 77 S.Ct. at 984. This circuit has taken the view that *any* direct questioning as to whether a witness had previously invoked his constitutional right to refuse to testify at a grand jury proceeding constitutes trial error. However, the error may be harmless if (1) the witness's testimony were remote from the crime charged and (2) there were no likelihood of confusion in the jury's mind which would link the defendants to the witness's assertion of the privilege. *See United States v. Glasser, supra,* 443 F.2d at 1006; *United States v. Sing Kee,* 250 F.2d 236, 240–41 (2d Cir. 1957), *cert. denied,* 355 U.S. 954, 78 S.Ct. 538, 2 L.Ed.2d 530 (1958).

*United States v. Youngblood,* 379 F.2d 365 (2d Cir. 1967). But here the witness appeared voluntarily and was cooperative with the defense at trial. On this basis, the appellants' claim that the grand jury minutes may have been useful for potential impeachment purposes is plainly frivolous.

15. If a subpoena had been necessary to secure the witness's testimony, and that testimony had surprisingly been unfavorable, the defense would have been entitled to examine and use the grand jury transcript to refresh the witness's recollection or to impeach his testimony. *See Dennis v. United States,* 384 U.S. 855, 868–70, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966);

This case differs from *Grunewald* and its progeny, however, because here the reference to the constitutional privilege was neither direct nor clear. This incidental reference to immunity provided before the grand jury was not itself framed as a question, but rather was contained in the question being asked. It was not flagged before the jury as it was in *Grunewald* and *Williams*. It was not even objected to at trial. The prosecutor's naughty words were in effect a flyspeck on this record, not a blot. Furthermore, it is postulating far too great a sophistication on the part of the jurors to conclude that, from the fact that immunity was provided to Lapin before the grand jury, they drew the inference that he had exercised his Fifth Amendment privilege to refuse to testify there. The fact that immunity is provided does not always imply that a Fifth Amendment refusal to testify has first occurred. For example, under the New York Criminal Procedure Law § 190.40 (McKinney 1967) all witnesses are granted immunity automatically by reason of their appearance before the grand jury unless the immunity is specifically waived. It would be wholly speculative to attribute to these lay jurors an understanding of the reference to immunity *en passant* as anything more than a description of the grand jury procedure. Here, moreover, the trial judge after only three questions and answers read by the prosecutor from the grand jury testimony (bearing on Lapin's representation of appellants and acquaintance with Conti) struck the line of inquiry altogether. Accordingly, we find no error in this questioning and need not reach the issue whether any putative error was harmless under *United States v. Glasser, supra.*

VI. *Admission at Trial of a Notebook Seized at Arrest.* The Government introduced into evidence at trial a black notebook which had been seized at the arrest of the appellants. As the police entered Russo's office to make the arrest, they found this notebook lying on the table in front of Russo. The notebook was in plain view, approximately a

foot and a half from where appellant Natale was standing at the time of the arrest. The book was lying shut on the desk, but when opened it was seen to be filled with apparently incriminating records of usurious transactions, including the ones involved in this case.

 There are two objections which have been raised to the admission of this evidence. The first is that the seizure of the notebook, though incident to the valid arrest of the appellants, was in violation of the Fourth Amendment. The validity of such a search is to be determined under the criteria of *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which restricts searches of the scene incident to arrest to the area that must be searched to ensure the protection of the officers and the preservation of easily disposable evidence. We are by no means convinced that the seizure of the notebook in this case was necessary either to protect the officers or to preserve the evidence from destruction. *See Coolidge v. New Hampshire,* 403 U.S. 443, 472, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1972). *But cf. United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (search of *person* incident to arrest valid even as to cigarette package; no need to protect evidence or arresting officer must be shown). We realize that some courts have chosen to water down the *Chimel* requirements, and have accepted justifications for searches incident to arrest which fall short of the "emergency" context in which this exception to the warrant requirement developed. *See United States v. Nevarez-Alcantar,* 495 F.2d 678, 682 (10th Cir.), *cert. denied,* 419 U.S. 878, 95 S.Ct. 141, 42 L.Ed.2d 117 (1974) (at arrest for disorderly conduct, search of locked suitcases valid); Note, *The United States Court of Appeals: 1973–1974 Term Criminal Law and Procedure,* 63 Geo.L.J. 331, 370 (1974). In this case, however, we need not determine the applicability of *Chimel* to the circumstances of this arrest. The reason is that the appellants have raised this

claim that the notebook should be suppressed for Fourth Amendment violations for the first time at this appeal. *United States v. Mauro,* 507 F.2d 802, 805–07 (2d Cir. 1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975) (failure to raise suppression claim prior to trial makes motion to suppress at trial untimely under Fed.R.Crim.P. 12(b) and 41(f)).

■ The appellants did validly raise at trial, and have therefore preserved for this appeal, a different objection to the admission of the notebook. They argued that there was nothing in the record to show that the notebook was the property of either Natale or Russo, and that absent authentication the document should be excluded. *See, e. g., McGowan v. Armour,* 248 F. 676 (8th Cir. 1918); 7 J. Wigmore, Evidence § 2129 (3d ed. 1940); McCormick's Handbook on the Law of Evidence §§ 218–26 (2d ed. 1972). The trial court's rejection of this argument was proper.

Proof of the connection of an exhibit to the defendants may be made by circumstantial, as well as direct, evidence. The prosecution need only prove a rational basis from which the jury may conclude that the exhibit did, in fact, belong to the appellants. *See United States v. Sutton,* 138 U.S.App.D.C. 208, 426 F.2d 1202, 1207 (1969) (while "mere contents" are ordinarily insufficient evidence of genuineness, contents may be considered in conjunction with other circumstances); *United States v. Montalvo,* 271 F.2d 922, 925 (2d Cir. 1959), *cert. denied,* 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960). In the words of Rule 901(a) of the new Federal Rules of Evidence (not yet effective at the time of trial),

[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Among the facts which support the finding of authenticity here are the presence of Natale and Russo at the place where the notebook was discovered, the fact that the office in which the arrest occurred and the notebook was seized was the same one in which Amato had held numerous meetings with Russo and Natale, Russo's admission that the office was his, and an entry in the notebook which referred to the $5,000 loan for $6,500 made to Amato. *See United States v. Sutton, supra,* 426 F.2d at 1207–08; 7 J. Wigmore, *supra* § 2148 (authentication by contents). These same facts also reveal the probative value of the exhibit as a record of the transactions testified to by Amato between Amato and the appellants.[16] Thus we hold that the document was sufficiently authenticated, was of significant probative value, and was therefore properly admitted into evidence by the trial court.

■ VII. *Use of "Other Crimes" Evidence and Instructions Thereon.* The appellants contend that it was improper to allow into evidence certain testimony and documentary proof which tended to show that Natale and Russo had been engaged in several usurious transactions both before and during the period of the conspiracy here charged. The appellants were not, of course, charged with usury at this trial. Therefore, evidence of their usurious transactions should not have been admitted if it were introduced *solely* to show that the defendants had criminal characters. *United States v. Papadakis,* 510 F.2d 287, 294 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). But if this proof

---

**16.** The entries in the notebook were, of course, evidence that an outstanding debt remained to be paid by Amato. The validity of this evidence was not disputed by the appellants, a fact which undercuts their argument in Part I of this opinion, *supra. See especially* text at notes 7–8 *supra.*

of "other crimes" was used at trial for any valid purpose *other* than to show the appellants' criminal character, then it should have been admitted so long as its probative value outweighed its potential prejudice. *United States v. Torres,* 519 F.2d 723, 727 (2d Cir. 1975); *United States v. Papadakis, supra.* The Government contends that this evidence was admissible to show the "background and development" of the conspiracy to use extortionate means to collect credit extensions. *See United States v. Torres, supra; United States v. Colasurdo,* 453 F.2d 585, 591 & n. 3 (2d Cir. 1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). We agree that this evidence helps to establish that Natale and Russo had continuing debtor-creditor relations with Amato and others, relations of a type which could not be enforced legally,[17] and therefore might well have been grounded in extra-legal methods of enforcement. Thus we have no trouble in concluding that the evidence of usurious behavior was relevant to the proof of a conspiracy to employ extortionate means to collect on such loans. Admission of this evidence was well within the discretion of the trial court.

■■■ Appellants' final contention is that the failure of the trial court to give cautionary instructions to the jury as to the limited use of the "other crimes" evidence was reversible error. However, the appellants' counsel failed to request such a limiting instruction either at trial or at the close of the case in the charge to the jury. Failure to have asserted this claimed right below precludes review here. *See United States v. Papadakis, supra,* 510 F.2d at 295; *United States v. Bozza,* 365 F.2d 206, 214 (2d Cir. 1966).

Having considered and rejected all of the appellants' arguments, we affirm the judgment below.

Judgment affirmed.