**UNITED STATES of America, Appellee,**

v.

**Arnold Nelson MAHLER and Dean H. Ubben, Appellants.**

**Nos. 912, 960, Dockets 77–1484, 78–1048.**

United States Court of Appeals, Second Circuit.

Argued May 2, 1978.

Decided June 26, 1978.

N. Richard Janis, Washington, D.C. (James E. Sharp, A. Raymond Randolph, Jr., Washington, D.C., of counsel), for appellant Mahler.

David Blackstone, New York City, for appellant Ubben.

Jed S. Rakoff, Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty. for the Southern District of New York, Pamela R. Chepiga, Frederick T. Davis, Audrey Strauss, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before MOORE, OAKES and GURFEIN, Circuit Judges.

OAKES, Circuit Judge:

Appellants Arnold Nelson Mahler and Dean H. Ubben appeal from their convictions by a jury following a trial in the United States District Court for the Southern District of New York, Milton Pollack, Judge. Their earlier seven-week trial before Judge Marvin E. Frankel ended in a mistrial when one of the jurors suffered a heart attack during the deliberations. On the retrial approximately five months later on a superseding indictment which narrowed and simplified the original charges,[1] Mahler and Ubben were convicted on all counts.[2] We affirm.

## I. Facts

In the summer of 1972, Mahler and an associate named Zucker[3] acquired control, in nominee form, of a publicly-tradeable but defunct corporation, Bell-Ko Film Corp., a shell with assets of $86. Ubben had meanwhile been retained as a consultant to International Industries, Inc. (International), a small private company in Colorado. International was the manufacturer of a purportedly revolutionary pneumatic industrial pump; the company was, however, virtually without sales and verging on bankruptcy.

In October of 1972 Mahler and Ubben agreed to reorganize these companies into a new corporation, Industries International Inc. (Industries), for the purpose of fraudulently manipulating the price of the company's publicly tradeable stock. Ubben and Mahler held the greater part of that stock in nominee name. Once the trading price rose Ubben and Mahler planned to dispose of their worthless stock at a substantial profit.

The fraudulent scheme was carried out by a series of questionable and often illegal

1. The original indictment in many respects was no longer relevant because several defendants pleaded guilty before the second trial was to begin or were acquitted in the first trial before the mistrial was declared.

2. Counts 1, 4, 6 and 7 charged violations of the securities fraud statute, 15 U.S.C. §§ 77q(a), 77x; Counts 2, 5, 9 and 11 charged violations of the wire fraud statute, 18 U.S.C. § 1343;

Counts 3, 8, 10 and 12 charged violations of the mail fraud statute, 18 U.S.C. § 1341; and Count 13 charged violation of the conspiracy statute, 18 U.S.C. § 371. The first 12 counts also charged violations of the aiding and abetting statute, 18 U.S.C. § 2.

3. Theodore Zucker pleaded guilty to a felony information prior to the first trial.

acts. Ubben first induced International's president, Billy Lovejoy,[4] to fire its outside accountants whose annual report would show a loss for the year ending September 30, 1972, and a net worth approaching zero, and to substitute Lawrence V. Bialek[5] whom Ubben described as an accountant who "for $500" would "put anything into a statement . . . ." Trial Transcript 726–27. Bialek soon produced a false financial statement showing a profit and a substantial net worth on the part of International as well as a pro forma financial statement fraudulently showing the reorganization of International and Bell-Ko into Industries as creating a company with a net worth of no less than $456,278.

To effect the reorganization, Mahler had his attorney, Harold C. Herman,[6] charter Industries as a new corporation, and cause it to issue 4 million shares of stock; 2.2 million of these were exchanged, on a 100 for 1 basis, for the existing 22,000 shares of International controlled by Billy Lovejoy. The remaining 1.8 million shares were for the most part controlled by Mahler, Ubben and Zucker under various nominee names,[7] some of the nominees' names being used despite their refusal to participate in the scheme.

Mahler then caused Industries to acquire the "assets" of Bell-Ko by exchanging 664,- 000 of Industries' shares for the 664,000 shares of Bell-Ko in a manner which ostensibly complied with SEC Rule 133, 17 C.F.R. § 230.133 (repealed effective January 1, 1973),[8] but which in fact fell outside of that Rule since, *inter alia*, the reorganization was intended simply as a step toward the sale of the surviving company's stock to the public.

Ubben then sought to stimulate a demand for Industries stock. He first persuaded a number of investors, commencing with the most prominent, from Des Moines, Iowa, to purchase several hundred thousand shares of Industries stock at $1 per share by publishing a false newsletter which grossly inflated the company's prospects primarily by touting fictitious qualities of the company's pump. Ubben falsely represented that the proceeds of the sales of stock would be used for production expenses. In actuality, some of the proceeds were used to stave off immediate bankruptcy while at least 45% of them were funneled to Ubben, Mahler and their accomplices. And Ubben promised that one of each of three shares purchased would be unrestricted, "free and tradeable" stock which could be resold once public trading began. This representation was fraudulent since Ubben had no such shares; he only had an illegal plan to turn Bell-Ko shares into free and tradeabale shares for

4.  Lovejoy pleaded guilty at the end of September, 1977, prior to the start of the second trial.

5.  Bialek was acquitted in the trial before Judge Frankel.

6.  Herman pleaded guilty to a felony information before the start of the first trial.

7.  Mahler and Ubben never sought the necessary approval of Industries' board of directors since most of the directors were not involved in the scheme. After the reorganization was effected, Mahler's attorney, Herman, simply drew up, without the board's knowledge, a back-dated set of minutes falsely reciting that the entire Industries board had convened and approved the reorganization. In conjunction with obtaining approval of the reorganization from those Bell-Ko shareholders not controlled by Mahler and Ubben, Zucker and Ubben prepared a false proxy statement which concealed that Mahler, Ubben and Zucker controlled 35% of Industries stock, and 60% of the only such stock that would qualify for public sale under a

Rule 133 reorganization. *See* note 8 *infra*. The proxy also contained the false financial statements prepared by Bialek.

8.  Rule 133 provided that if a public company was merged or reorganized with a private company under circumstances where no distribution of stock to the public was contemplated, no SEC registration was required for the merger or reorganization itself. Moreover, the shares of the old public company could, if various specified conditions were fulfilled, become publicly tradeable without further registration. The SEC rescinded the Rule as of January 1, 1973, because it created a vehicle for the types of fraud perpetrated by Mahler and Ubben, of which the present case presents a rather typical example. *See, e. g., SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975). *See also United States v. Frank*, 520 F.2d 1287 (2d Cir. 1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976).

these investors. With all this bait, Ubben was able to attract the fish in Des Moines before public trading had even begun.

In the meantime, Mahler and Ubben bribed a New York stock broker, William Wellens,[9] to induce his firm to make a market in Industries stock. To lure other brokers into the market, a "two-martini" meeting for over-the-counter brokers was held in Manhattan. At the meeting—complete with tape-and-slide show ("offering revolutionary products to a waiting world")—the proxy statement with Bialek's false financial statements and an updated financial statement with even "better" figures appearing under the letterhead of a Denver firm which had not prepared the financials[10] was distributed. Ubben and Lovejoy also made numerous gross misrepresentations of the firm's prospects. The next day Wellens had his brokerage firm list Industries in the national daily quotations— the "pink sheets" furnished to over-the-counter brokers.

When trading opened on February 28, 1973, Industries stock traded at $1 per share. But since the demand generated in Des Moines could only be met through the limited supply of Rule 133 stock, Mahler and Ubben were able to manipulate the trading price so that it soon climbed to nearly $5 per share. Ubben and Zucker then sold at least 80,000 shares. The restrictive legend on the shares had been removed when Harold Herman prepared opin-

ion letters based on false representations by Mahler directing the transfer agent to remove the legend. The appellants were seeking to "free up" another 180,000 shares by forged opinion letters and phony representations falsely attributed to six of their nominees when the transfer agent balked; an SEC investigation had become public knowledge.

On March 27, 1973, after the stock had reached nearly $7 per share, the SEC suspended trading. Soon thereafter, the company filed for bankruptcy. While Ubben and Mahler engaged in numerous other misrepresentations and acts, including a scheme to conceal their fraud, which involved backdating some and destroying other documents, rigging a postage meter and perjury, the foregoing sketch of the facts suffices to impart some the flavor of this "shellgame" securities fraud. We turn then to the legal points raised by Mahler and Ubben.

## II. Discussion

### A. Rule 609(b)

Mahler's most substantial point relates to the introduction into evidence by the Government of Mahler's prior convictions[11] pursuant to Rule 609(b)[12] of the Federal Rules of Evidence. This evidence had previously been admitted in the Government's direct case, under Rule 404(b), for the limited purpose of proving knowledge and in-

---

**9.** William Wellens pleaded guilty to a felony information prior to the first trial.

**10.** The letterhead was apparently borrowed by one David Norbloom, who pleaded guilty to a felony information prior to the first trial, from a friend of his who worked at the Denver firm of Dalby & Associates. Norbloom also forged the signature Gordon C. Dalby to the cover letter accompanying the fabricated financial statement.

**11.** In 1965, Mahler was convicted by a jury of conspiracy, with his accomplices in a stock fraud scheme, to lie to the Securities and Exchange Commission and of giving false testimony under oath to the SEC. In 1967, he pleaded guilty to six counts of stock fraud and one count of conspiracy to commit stock frauds.

**12.** Rule 609(b) states:

Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.
Fed.R.Evid. 609(b).

tent. *See* note 20 *infra*. It was readmitted after Mahler took the stand, to impeach his credibility.

Mahler indicates that since his convictions were more than ten years old as measured by Rule 609(b), they were admissible only if their probable value substantially outweighed their prejudicial effect. The heart of the contention is that the determination of this balancing process must be an on-the-record finding supported by specific facts and circumstances and that no such finding was made. Mahler's pretrial motion to exclude the prior convictions for purposes of impeachment had been denied on the basis that the same motion had been considered and denied at the first trial by Judge Frankel and that no new facts warranted a change. However, Mahler rightfully points out that at the time of the first trial the convictions were less than ten years old whereas at the time of the second trial, they were more than ten years old. Consequently, their admissibility at the second trial was subject to the requirements of Rule 609(b) rather than Rule 609(a).

■ The Government urges in response that an on-the-record finding is not required either by the language or by the legislative history of the Rule. We disagree and conclude that when convictions more than ten years old are sought to be introduced pursuant to Rule 609(b), the district judge must make an on-the-record finding based on specific facts and circumstances that the probative value of the evidence substantially outweighs the danger of

unfair prejudice. We reach this result for four reasons.

First, we believe that the language of the Rule clearly suggests such an on-the-record determination. The decision to admit such evidence must be "supported by specific facts and circumstances." If this wording did not contemplate an on-the-record finding by the district judge, it could simply be stricken from the Rule with no linguistic or syntactical harm to the rest of the sentence. The position espoused by the Government would make the language mere surplusage, totally devoid of meaning. Moreover, it is difficult to determine whether a ruling is indeed "supported by specific facts and circumstances" unless the basis of the ruling is carefully spelled out. The Government's suggestion that the notice requirement of Rule 609(b) [13] serves as a surrogate factual predicate for review of district court rulings is not persuasive. The language of the notice requirement as well as the legislative history pertaining to it [14] make absolutely clear that the limited purpose of giving notice was to avoid unfair surprise to a defendant and to afford him the opportunity in the words of the Rule to "contest the use of such evidence." [15]

Second, the legislative history of Rule 609(b), over and above that specifically related to the notice requirement, militates in favor of concluding that the Rule contemplates an on-the-record determination of admissibility. According to the House Report, the version of Rule 609(b) passed by the House would have barred the use of all convictions more than ten years old. [16] Some eleven months later the Senate Re-

**13.** *See* note 12 *supra*.

**14.** *See* H.R.Conf.Rep.No.93–1597, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7098, 7103 [hereinafter Conference Report].

**15.** *See United States v. Shapiro*, 565 F.2d 479, 481 (7th Cir. 1977) (purpose of notice requirement is "to avoid surprise").

**16.** With respect to Rule 609(b), the House Report states in its entirety:

Rule 609(b) as submitted by the Court was modeled after Section 133(a) of Public Law 91-358, 14 D.C.Code 305(b)(2)(B), enacted in 1970. The Rule provided:

Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the release of the witness from confinement imposed for his most recent conviction, or the expiration of the period of his parole, probation, or sentence granted or imposed with respect to his most recent conviction, whichever is the later date.

Under this formulation, a witness' entire past record of criminal convictions could be used for impeachment (provided the conviction met the standard of subdivision (a)), if the witness had been most recently released from confinement, or the period of his parole or probation had expired, within ten years of the conviction.

port adopted a different position from that of the House. The Senate version would have permitted the use of convictions more than ten years old,

> but only upon a determination by the court that the probative value of the conviction supported by specific facts and circumstances, substantially outweighs its prejudicial effect.
>
> It is intended that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances. The rules provide that the decision be supported by specific facts and circumstances thus *requiring* the court to make *specific findings on the record* as to the particular facts and circumstances it has considered in determining that the probative value of the conviction substantially outweighs its prejudicial impact. It is expected that, in fairness, the court will give the party against whom the conviction is introduced a full and adequate opportunity to contest its admission.[17]

The Senate version was ultimately adopted with the notice requirement added in Conference [18] for the purpose of avoiding surprise and allowing the defendant to contest admission as the Senate evidently contemplated from its Report quoted above. The thrust of the legislative history then indicates that an on-the-record finding for convictions more than ten years old was contemplated by the Congress. The Senate

said so explicitly. And the Senate view ultimately prevailed with the slight addition of the notice requirement, a modification which was clearly presaged by the Senate in its own report.

Third, the case law, while not entirely consistent, assumes that Rule 609(b) requires an on-the-record finding. *See United States v. Little*, 567 F.2d 346, 350 (8th Cir. 1977) (fourteen-year-old fraud conviction admitted under 609(b) after a "hearing on the defendant's motion *in limine* and after considering the arguments on both sides"); *United States v. Shapiro*, 565 F.2d 479 (7th Cir. 1977) (after on-the-record hearing judge admitted evidence of 38- and 24-year-old convictions; ruling reversed on appeal); *United States v. Cohen*, 544 F.2d 781, 785–86 (5th Cir.) ("[w]hile Rule 609(b) may envision a . . . proceeding with full findings setting forth the quality and nature of any possible prejudice to the defendant," failure to do so *here* was not reversible error), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2175, 53 L.Ed.2d 224 (1977); *cf. United States v. Mahone*, 537 F.2d 922, 928–29 (7th Cir.) (future admission of prior convictions pursuant to Rule 609(a)(1) requires on-the-record determination), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976).

Finally, from a policy standpoint an on-the-record determination is a prudent requirement. The divergent positions initial-

---

The Committee amended the Rule to read in the text of the 1971 Advisory Committee version to provide that upon the expiration of ten years from the date of a conviction of a witness, or of his release from confinement for that offense, that conviction may no longer be used for impeachment. The Committee was of the view that after ten years following a person's release from confinement (or from the date of his conviction) the probative value of the conviction with respect to that person's credibility diminished *to a point* where it should no longer be admissible. H.R.Rep.No.93–650, 93d Cong., 1st Sess., *reprinted in* [1974] U.S.Code Cong. & Admin. News, pp. 7075, 7085.

**17.** S.Rep.No.93–1277, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin. News pp. 7051, 7062 (emphasis added); *see* Estes, *The New Federal Rules of Evidence*, 65 F.R.D. 267, 277 (1974).

**18.** *See* S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 332 (2d ed. 1977). The Conference Report states:

> The Conference adopts the Senate amendment with an amendment requiring notice by a party that he intends to request that the court allow him to use a conviction older than ten years. The Conferees anticipate that a written notice, in order to give the adversary a fair opportunity to contest the use of the evidence, will ordinarily include such information as the date of the conviction, the jurisdiction, and the offense or statute involved. In order to eliminate the possibility that the flexibility of this provision may impair the ability of a party-opponent to prepare for trial, the Conferees intend that the notice provision operate to avoid surprise.

Conference Report, *supra* note 13, U.S.Code Cong. & Admin.News 1974, p. 7103.

ly adopted by the House and Senate to some extent mirror the controversy that surrounds the use of prior convictions. The House believed that convictions more than ten years old have very little or no probative value. *See* note 16 *supra*. Yet the risk of convicting a defendant for his past transgressions always exists; consequently they should be used only "very rarely and . . . in exceptional circumstances." *See* note 17 *supra*. In addition, an on-the-record determination will facilitate appellate review of 609(b) rulings. And the Government itself concedes that the rule advocated by Mahler "might be the better practice." [19] We are certain that it is and therefore adopt the view that when convictions more than ten years old are sought to be introduced into evidence pursuant to Rule 609(b) the district judge should make an on-the-record determination supported by specific facts and circumstances that the probative value of the evidence substantially outweighs its prejudicial effect.

■ Having said all this, we are nonetheless persuaded that the error in this case was harmless. The convictions admitted pursuant to Rule 609(b) had, as we have said, already been properly introduced for a different purpose pursuant to Rule 404(b).[20] Thus any incremental prejudice flowing from the use of the convictions for impeachment purposes had to have been minimal.[21] The overwhelming evidence of guilt in this case clearly dictates a conclusion of harmless error. *United States v. Corey*, 566 F.2d 429, 432 (2d Cir. 1977).

## B. Other Contentions

■ The remaining arguments raised by Mahler and Ubben merit only the most cursory discussion. Mahler's unfair trial claim stemming from the alleged hostility and bias of the district judge is unpersuasive. As part of this claim, Mahler points to what he considers to be indicia of the district judge's adverseness. For example, the judge denied Mahler's motion for a continuance following the superseding indictment of October 4, 1977. This ruling was entirely proper, however, since the new indictment merely streamlined the old. Mahler has not particularized a single substantive difference between the two indictments as they apply to him.[22]

Mahler also argues that Judge Pollack intervened on behalf of the prosecution to buttress their witnesses and to deflate defense witnesses. But this is an unfair distortion of what really transpired. The judge intervened very infrequently, asking probably no more than 2% of all questions.

19. Brief for Appellee at 43.

20. Rule 404(b) states:

> Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b). Mahler's claim that evidence of his prior convictions should have been excluded on the ground that it was unduly confusing to the jury is without merit. Reading 21 pages of transcript from Mahler's trial on his prior criminal convictions took but a few minutes. It was redacted by Judge Pollack from 75 pages. Moreover, reading the transcript was probably necessary so that the jury could understand the nature of the prior similar acts and specifically how they were or were not probative of Mahler's guilt in the ongoing trial. Mahler, it should be noted, has not contested the relevance of the evidence.

21. In view of the Government's very strong case against Mahler and in view of the fact that his prior convictions had already come in to show knowledge and intent, it is difficult to understand why the Government thought it necessary to introduce this evidence again to impeach Mahler. Discretionary restraint on the part of prosecutors may eliminate appealable issues of convicted defendants; it may also ensure that undue emphasis is not placed on the prior convictions by the jury.

22. On October 11, 1977, Mahler sought a writ of mandamus to compel Judge Pollack to grant a continuance of his trial date for at least 30 days in view of the superseding indictment filed on October 4, 1977. For reasons unknown to us, Mahler's petition was never referred to a panel of this court. Nevertheless, Mahler has raised the substance of his position as one of his points on this appeal. Thus while the mandamus petition is moot, Mahler has claimed that the failure to grant the desired continuance constitutes reversible error. As indicated above, we reject that contention.

*Cf. United States v. De Sisto*, 289 F.2d 833, 834 (2d Cir. 1961) (judge asked 3,115 questions, prosecution 1,381, and three defense counsel, 3,330). Moreover, the quality of the questions asked were primarily of a clarifying nature. *See United States v. Natale*, 526 F.2d 1160, 1169–70 (2d Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). Neither the level of intervention nor of judicial impatience in any way approaches the judge's interjections of himself into the trial in *United States v. Nazzaro*, 472 F.2d 302 (2d Cir. 1973).[23]

As further evidence of what appellant Mahler calls the judge's bias, he claims that the district judge gave an unbalanced charge and never considered the defense's charge requests. However, Mahler's request for instructions, consisting of an annotated transcript of the 117-page charge delivered by Judge Frankel at the first trial, was not in proper form and he was so advised. Judge Pollack nevertheless actively solicited counsel's assistance in the preparation of his charge. The defense was, however, not responsive, relying on the annotated transcript. Mahler was in all respects accorded a fair trial.

■ Ubben's other contentions are all without merit. He argues first that Judge Pollack's failure to discharge the alternate jurors when the jury retired to deliberate requires a hearing to determine whether this procedure prejudiced the defendants. Since the judge was careful to assure that there was no contact whatsoever between the jurors and the alternates, no conceivable prejudice could have resulted from the decision not to discharge the alternates. *United States v. Nash*, 414 F.2d 234 (2d Cir.), *cert. denied*, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242 (1969). Since there is nothing to indicate that prejudice could have resulted, a hearing is unnecessary.

■ Ubben's claim of improper limitation on the scope of cross-examination is similarly unpersuasive. Ivan Braverman, a Government witness who testified that the financial statements prepared by Bialek were both improper and not accidental, was cross-examined at length. He was excused and a luncheon recess followed. After lunch, Ubben sought to introduce Bialek's acquittal in the first trial to undercut Braverman's testimony, a request refused by the district judge. The refusal was proper since Bialek's acquittal was not relevant to Braverman's opinion that the manner in which Bialek prepared the financial statements was not accidental. Bialek's theory at the first trial, which the jury must have credited, was that he was duped by Ubben into thinking he was preparing projections for internal use. If anything, Bialek's acquittal might have been probative of Ubben's guilt; its exclusion therefore was not error.

■ Ubben's final contention is that his eight year sentence is disparate and excessive. His reliance on *United States v. Ramos*, 572 F.2d 360 (2d Cir. 1978), is, however, totally misplaced since that case stands for the proposition that resentencing will be required when a judge has relied upon improper considerations in the sentencing determination. Here, both Judge Frankel and Judge Pollack were satisfied that Ubben perjured himself; Judge Pollack could properly consider that in his sentencing. *United States v. Hendrix*, 505 F.2d 1233, 1237 (2d Cir. 1974), *cert. denied*, 423 U.S. 897, 96 S.Ct. 199, 46 L.Ed.2d 130 (1975). Ubben, of course, was one of the

---

**23.** Mahler also claims that the district judge improperly assisted the prosecution by questioning a defense witness, Charles Hecht. Hecht, however, was not a key witness since he had no knowledge of the events for which Mahler stood trial. His testimony went to events which transpired before the scheme for which Mahler was under indictment commenced. In addition, several of the specific interventions were to get Hecht, a lawyer, to answer the questions asked; others were to elicit correct statements of law from Hecht after he had given erroneous ones. *Cf. United States v. Natale*, 526 F.2d 1160, 1170 (2d Cir. 1975) (judge's interrogations of defense witness who was a lawyer "were intended to assist the jury in its evaluation of the nature of the transactions . . . ."), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). Ubben's argument that Judge Pollack's intervention into Hecht's testimony prejudiced him stands on an even weaker footing since Hecht's testimony was not directly relevant to Ubben.

**738**

two most important figures in the fraud; thus a substantial sentence was in order. The eight year sentence was in conformity with sentences recently meted out for fraudulent "white-collar" schemes by courts across the country. *E. g., United States v. McCord,* Cr. 3–76–132 (N.D.Tex.1976) (sentences of ten to fifty years for various defendants in mail fraud), *aff'd without opinion sub nom. United States v. Deaton,* No. 77–5277 (5th Cir. 1977); *United States v. Lofland,* 75 Cr. 769 (fifteen year sentence for mail fraud), *aff'd without opinion,* 535 F.2d 1244 (2d Cir. 1976). And finally, Judge Pollack was in the best position to determine an appropriate sentence for Ubben. *United States v. Robin,* 553 F.2d 8, 11 (2d Cir. 1977). His judgment was not an abuse of discretion since it was within the statutory maximum and did not rest upon improper considerations. *United States v. Seijo,* 537 F.2d 694 (2d Cir. 1976), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977).

The other points raised by the defendants warrant no discussion.

Convictions affirmed.