UNITED STATES of America, Plaintiff-Appellee,

v.

Donald Eugene COLYER, Defendant-Appellant.

No. 77–5259.

United States Court of Appeals, Fifth Circuit.

April 21, 1978.

Werner A. Powers, Dallas, Tex. (Court-appointed), for defendant-appellant.

Kenneth J. Mighell, U. S. Atty., R. H. Wallace, Jr., Gerhard Kleinschmidt, Ronald C. H. Eddins, Asst. U. S. Attys., Fort Worth, Tex., for plaintiff-appellee.

Before WISDOM and GEE, Circuit Judges, and VAN PELT *, District Judge.

VAN PELT, Senior District Judge:

Appellant was indicted and convicted by a jury of unlawfully transporting in interstate and foreign commerce a lost and fraudulently obtained credit card (Master Charge) in violation of 15 U.S.C. § 1644(b). On appeal, he raises the following issues:

1. Whether the trial court erred in restricting cross-examination of the lawful credit card owner as to whether he was a homosexual;

2. Whether the Master Charge tickets showing purchases made during the time the card was lost or stolen were properly admitted into evidence; and

3. Whether appellant was prejudiced by the government's delayed disclosure during the trial, and after the credit card owner's identification of appellant in court, that the owner had been unable to identify appellant's photo when shown a photographic spread prior to trial.

We affirm.

On Monday, December 8, 1975, Robert Miller reported to the Master Charge department of his bank that his billfold and Master Charge card were missing. Master Charge records show the card was reported as being lost. Miller testified that he had gone Christmas shopping late Saturday afternoon, December 6, and had visited several bars as the evening progressed. His final stop was the 651 Club, which was described by him as "a bar that is frequented by quite a variety of people, among them are the gay element of Fort Worth, homosexuals." Tr. at 7. He had a number of beers there and met a man whom he invited to his apartment for more beers. He identified Donald Colyer at the trial as this man. Miller testified that:

> Sometime during the night I fell asleep and when I woke up he was gone and my wallet was gone.

Tr. at 7.

In addition to Miller's testimony, the government offered 61 Master Charge tickets showing purchases made mostly in Mexico and during the time the card was reported lost. A handwriting and fingerprint expert testified (1) that he had been able to identify 11 latent fingerprints on 9 of the Master Charge tickets as belonging to Donald Colyer after comparing the latent fingerprints with known fingerprints from Colyer; and (2) that by comparing handwriting samples from both Colyer and Miller with the signatures on the Master Charge tickets, he had determined that the signatures on all 61 of the charge tickets, and the endorsement on the back of the Master Charge card as well, were made by Colyer.

The defendant did not testify but called as witnesses his wife and his sister. They testified that he was at home during the time period the charges were made in Mexico. His wife testified she spent the evening of December 6, 1975, with her husband. In rebuttal, the government offered the testimony of Colyer's mother-in-law. She testified that she, her husband, and 14 year old daughter arrived at her daughter Veleta's home December 20, 1975. Donald Colyer was not there. She was told by Veleta that Colyer was working in Mexico and had been gone two or three weeks. Colyer returned on Monday, December 22. According to his mother-in-law's testimony, he arrived with clothes, dresses, liquor, boots, pants, shirts, and a couple of short coats. He had several suitcases and had to make several trips to bring in everything. Colyer's mother-in-law admitted on cross-examination that she did not especially like Donald Colyer. The daughter had testified earlier that her mother had never liked her husband and disapproved of their marriage.

* Senior District Judge of the District of Nebraska, sitting by designation.

## I. LIMITATION OF CROSS–EXAMINATION

During the trial, defense counsel[1] asked Miller if he was a homosexual.[2] An exchange followed between the prosecutor and the court, wherein the prosecutor objected on the basis this was getting into an area where Miller would be entitled to invoke his Fifth Amendment rights against self-incrimination. The court agreed and sustained the objection. The record does not reflect any unwillingness on the part of Miller to answer the question, or that he himself invoked the Fifth Amendment.

On appeal, appellant Colyer contends (1) that by the restriction of cross-examination he was denied his Sixth Amendment right of confrontation; (2) that the trial court abused its discretion by invoking the privilege for the witness and by restricting cross-examination; (3) that Miller waived his right to invoke the privilege by testifying that the club was frequented by homosexuals; (4) that the district court erred in failing to strike the direct testimony of Miller.

■ This case is unique in that the witness did not directly invoke the privilege. While the government admits that the procedure followed by the trial court "was not in accordance [with] the guidelines which this Court has established for resolving Fifth Amendment claims of witnesses . . . .", citing *United States v. Moreno*, 536 F.2d 1042 (5th Cir. 1976),[3] the govern-

---

1. Counsel for appellant in this court did not represent him in the lower court.

2. The actual transcript is as follows:

 Q It was . . . your testimony that [the 651 Club] was a congregation place for certain people that are gay or homosexual. Are you of this persuasion yourself? Are you homosexual yourself?

 MR. KLEINSCHMIDT: Your Honor, I am going to object at this time. I believe Mr. Davis knows that he is getting very close to an area where Mr. Miller would be entitled to plead the Fifth Amendment rights because of state law.

 THE COURT: Yes, I will sustain the objection. I believe the testimony was—I will instruct any witness that they do not have to answer any question that might in any way incriminate them on any criminal matter or charges. He can claim the Fifth Amendment at any time. The testimony, as I recall it, was that this was a bar frequented by gay people.

 MR. DAVIS: Your Honor, may I approach the bench?

 THE COURT: Yes.

 (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH OUTSIDE THE HEARING OF THE JURY)

 MR. DAVIS: Your Honor, it would appear to me that the witness is claiming that this defendant stole the credit card, but he also admitted he had invited this defendant to his place for what may have been a homosexual rendezvous. It could well be that we could establish the fact that he had given the credit card to the defendant as consideration.

 MR. KLEINSCHMIDT: I would suggest, in response to that, that Mr. Davis can certainly ask the witness anything along that line without getting into saying whether he is, in fact, a homosexual.

 MR. DAVIS: I will proceed that way then.

 THE COURT: There is no question you can ask him if he gave it in return for favors.

 MR. DAVIS: Okay.

 Tr. at 28–29. Counsel later followed up in open court by asking:

 Q Now, then is it possible that you perhaps made a gift of the card or other cards or money to the person in consideration of a favor?

 A No.

 Q Of some sort?

 A No.

 Q That is not possible?

 A No.

 *Id.* at 29.

3. In *Moreno, supra*, the defendant's conviction was reversed where the trial court conducted an in camera hearing, in the absence of defendant and his counsel, and totally excused an informer witness from testifying. The *Moreno* opinion indicated that there was no showing that the informer could not have testified concerning the narcotics transaction involving defendants—his concern about possibly incriminating himself went to prior events. The *Moreno* opinion indicates that when a witness invokes the privilege against self-incrimination, the trial court cannot accept the witness' claims at face value but must conduct a searching inquiry into the validity and extent of the witness' claim with respect to each challenged question, and that a blanket refusal to answer will not lie. *Id.* at 1046–1049. Granting that such procedure was not followed here, there was no need for a searching inquiry by the court. Miller had already testified that he had knowingly gone to a bar in Fort Worth which was frequented by homosexuals, and that he had invited a man home with him for beers. The fact that Miller might be incriminating

ment does not cite any case which is factually similar. Given the record, we have to assume that the trial court sustained the objection to the question not because it exceeded the scope of direct examination or for any other of the usual objections, but solely because the witness would be entitled to invoke the Fifth Amendment.

This Circuit has explored the conflict between a witness' Fifth Amendment rights and a criminal defendant's Sixth Amendment right to confrontation in *Fountain v. United States,* 384 F.2d 624 (5th Cir. 1967), *cert. denied,* 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968). *Fountain* indicates that the proper inquiry is (1) whether the witness may properly invoke the privilege and, if the answer to that question is affirmative, (2) whether the jury may consider the witness' testimony already received on direct examination.

 It has been stated that invoking the Fifth Amendment privilege is personal to the witness. *United States v. Mayes,* 512 F.2d 637 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670; 423 U.S. 840, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975). *See also* McCormick, Evidence § 120 (2d ed. 1972). This means the defendant or a third party may not use a witness' privilege to their own benefit by invoking it. However, it is not clear how far a third person can go toward persuading the witness to invoke the privilege in his own behalf. In *Mayes, supra,* at 649, the court stated:

> While the witness is entitled to the advice of counsel before determining whether he should invoke the privilege, . . . and while it is within the discretion of the trial judge to permit counsel for the witness to invoke the privilege on his behalf, 8 Wigmore, [Evidence] § 2270 [McNaugh-

ton rev. 1961], the nature of the privilege is such that in the final analysis the controlling decision is that of the witness himself.

In *Mayes,* counsel for defendant also served as counsel for three of the witnesses who intended to testify for the government. However, their "counsel" asserted their privilege and effectively kept them from testifying. The Court of Appeals for the Sixth Circuit held that defendant could not claim he was denied his right of confrontation where the witnesses' silence was procured for defendant's benefit. Thus, although the *Mayes* opinion contains some broad language about counsel invoking the privilege on the witness' behalf, that language ends up being dicta where in fact the privilege was invoked for the defendant's benefit. The *Mayes* court was extremely critical of the trial court for allowing this to happen.

This circuit has previously considered the duty a judge has to protect a witness' interest. In *United States v. Wilcox,* 450 F.2d 1131 (5th Cir. 1971), *cert. denied,* 405 U.S. 917, 92 S.Ct. 944, 30 L.Ed.2d 787 (1972), the defendant-appellant claimed the judge should have exerted more pressure upon a witness to testify and should have threatened the witness with contempt. However, the court did not go that far, and said:

> This claim ignores a number of important factors. First, the Judge is present as the embodiment of the Constitution, charged with the firm duty to see that the rights of all are upheld—the defendants, the witnesses and the public. Whether and to whatever extent it may be the duty of the trial judge to caution a witness about his Fifth Amendment rights, a careful one never hesitates.

> Although we have no information as to how the Texas law is enforced, we feel compelled to disagree. Had Miller answered the question in the affirmative, he might have waived his privilege and there was no guarantee that the further questioning would not have incriminated Miller. We find no merit to appellant's contention that Miller had already waived the privilege simply by admitting to the nature of the 651 Club and that he had invited a man home for a few beers.

himself if he admitted he was a homosexual is obvious. Tex.Penal Code Ann. § 21.06(a) prevents persons of the same sex from engaging in deviate sexual intercourse. On appeal, appellant argues that his counsel in the lower court:

> could have elicited from Miller information bearing on Miller's homosexuality, together with information of various types of homosexual conduct, without incriminating Miller under Texas law.

Appellant's Brief at 16.

*Id.* at 1139. *Wilcox* indicates that the judge's role of impartiality commands that he not take sides. After the claim is asserted, the judge must handle it in a way which does not prejudice the defense.[4] In *United States v. Lacouture,* 495 F.2d 1237, 1240 (5th Cir.), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974), this court has indicated that a judge must be alert to the witness' right against self-incrimination. In *Lacouture* the witness' attorney told the court that his client had refused to answer questions before the Grand Jury on his advice, and that she would do the same in the district court. The trial court asked her if this was true. The witness replied she didn't know, would like to think it over, wanted to see justice done, but didn't want to incriminate herself. The trial court concluded that if she was put on the stand she would claim the privilege and ruled she would not be allowed to testify in the presence of the jury. *Lacouture* concluded that the court had *not* claimed the privilege for the witness.

> The court's remarks do no more than reveal a proper solicitude for her rights, and his preliminary determination that she would refuse to answer was not erroneous.

*Id.* at 1240–41.

█ While we commend the trial court's solicitude for the witness' rights in this case, especially since it appears that the witness was not represented by counsel, we do believe the better practice would have been to ask the witness either whether he desired to claim the privilege or whether he wanted to consult with his attorney.[5] We find nothing in the federal case law to indicate that the trial court is entitled to assume the witness will claim the privilege simply because it is available and there is a valid basis for granting the privilege. While most witnesses will choose to remain silent in such circumstances, the choice to invoke the privilege should still be exercised by the witness. The privilege may be exercised in a variety of ways—a refusal to answer the question, asking the court or the attorney if the witness has to answer, mentioning the Fifth Amendment, or simply remaining silent. A court should be alert to any indicators that the witness wishes to invoke the privilege against self-incrimination. However, the record here does not reflect any reluctance on the part of the witness to answer the question. This case is therefore distinguishable from *Lacouture, supra.* We conclude that the court did claim the privilege for the witness and that it should have been exercised by the witness.

█ However, we find that any error in this case was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). After hearing the testimony, the jury could not have missed the clear inference that Miller may have invited Colyer back to his apartment for more than simply a few beers and a philosophical discussion. The crucial question was whether Miller gave the card to Colyer in return for sexual favors. Counsel was not prevented from asking questions relating to favors and did, in fact, ask.[6] Negative answers were received. It was for the jury to determine the credibility of the witness.[7]

---

4. The final determination of whether the privilege may be invoked always rests in the trial court's discretion. *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *Moreno, supra.*

5. See *Wilkes v. United States,* 136 U.S.App. D.C. 102, 419 F.2d 684 (1969), where the trial court informed a government witness of the privilege against self-incrimination and adjourned court for the day in order to give the witness time to consult with his attorney.

6. See n. 2 *infra.* The record also shows Miller was asked on direct whether he had given anyone permission to use or sign the card.

7. If Miller were a homosexual, it would have nothing to do with his credibility as a witness. See *Tinker v. United States,* 135 U.S.App.D.C. 125, 417 F.2d 542, *cert. denied,* 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969). *See also United States v. Nuccio,* 373 F.2d 168 (2d Cir. 1967), *cert. denied,* 392 U.S. 930, 88 S.Ct. 2285, 20 L.Ed.2d 1388 (1968). In *Nuccio,* the Second Circuit found no error in limiting cross-examination of government's witness as to whether he had made homosexual advances to one of the defendants. The court concluded that it was wrong to permit such cross-examination

Further, a motion to strike the direct testimony of Miller was never made. We have repeatedly stated that where there is a failure to make an objection to the admission of evidence or a motion to strike, such objection is deemed to be waived. *United States v. Grant,* 519 F.2d 64, 66 n. 3 (5th Cir. 1975); *United States v. Lipscomb,* 435 F.2d 795, 803 (5th Cir. 1970), *cert. denied,* 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971). We conclude on the record of this case there was no reversible error and appellant was not prejudiced.

## II. ADMISSIBILITY OF MASTER CHARGE TICKETS

During the time Miller's Master Charge card was allegedly stolen, the bank received 61 purchase tickets showing the use of the card. Larry Hutcheson, assistant manager of Security and Fraud Control at the Fort Worth National Bank and Master Charge Division, testified as to how the Master Charge system works, i. e. what normally happens when a purchase is made, how cancellations are sent out to merchants when a card is stolen or lost, and how the charge tickets are returned to the issuing bank and run through a proof machine which automatically flags charge tickets generated from a lost or stolen card. Mr. Hutcheson testified he pulled the tickets generated from the fraudulent use of Miller's card which the proof machine flagged, and he kept them in his custody and control in a case file until he turned them over to the Postal Inspector.

Appellant argues that he was denied his Sixth Amendment right of confrontation and that a business record kept in the files of one business but made by another is inadmissible. This question was settled previously in *United States v. Flom,* 558 F.2d 1179, 1183 (5th Cir. 1977). *Flom* held that under Fed.R.Evid. 803(6), where the circumstances indicate trustworthiness, it is not necessary that the person who kept the record or even had supervision over its preparation testify. *See also United States v. Jones,* 554 F.2d 251 (5th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 202, 54 L.Ed.2d 142 (1977); *United States v. Pfeiffer,* 539 F.2d 668 (8th Cir. 1976). These cases indicate that the trial court has great discretion in determining whether the document is trustworthy. We find no abuse of discretion where the witness testified that these records were made and kept in the regular course of business and it was the regular course of business to make such records, that he was the custodian of the records, and the witness was knowledgeable as to how they arrived at his bank and how they were handled once they were received at the bank. Nothing more is required.

## III. IDENTIFICATION OF APPELLANT

At some point during the investigation of the stolen card, Miller was shown a photographic spread by a postal inspector. It contained appellant's picture. Miller was unable to identify anyone. The government "inadvertently" failed to mention this fact to defense counsel and did not turn over the photographic spread prior to trial as required by *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

merely to discredit a witness' character, and, while it might be relevant to show bias and motive, there was considerable testimony in the case as to the homosexual approach. The court weighed the interests of the parties and found that if the witness had been asked if he were a homosexual an affirmative answer would have had slight probative value and would have had an adverse effect of embarrassing the witness. The same could be said here. Even if Miller had admitted he was a homosexual or had such a relationship with

Colyer, it would not prove the credit card was given to Colyer as opposed to stolen by him.

Although not urged as a basis for the trial court's rulings, support is found in Fed.R.Evid. 611(a) which says:

"The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . (3) protect witnesses from harassment or undue embarrassment."

The trial court's action was within the reasonable control which he has under the rules.

On the first day of the trial, Miller identified appellant as the person he had been with on the evening of December 6 when his card was stolen. Sometime during the first day of trial the government informed the court and defense attorney of the photo spread. The pictures were turned over to the defense attorney when court adjourned the first day. Additionally, the United States Attorney stated:

Your Honor, I would also like to enter into the record that we have advised [the defense attorney] that in the event he would like to have Mr. Miller recalled we will get him back.

Tr. at 71–72.

■ The next morning, Mr. Miller was recalled to the stand by the government. He was shown the photo spread. He testified that at the time he was shown the photo spread by the Postal Inspector he had not been able to identify anyone. However, he indicated he could now identify appellant. On cross-examination, defense counsel merely re-asked Miller whether he had been able to identify anyone in the photo spread when it was initially shown to him. No objection was made to the fact the information had not been disclosed earlier. There was no motion to strike Miller's earlier testimony, or for a mistrial. The question is whether the government's failure to disclose was harmless. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Joseph,* 533 F.2d 282, 286 (5th Cir. 1976), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1698, 52 L.Ed.2d 389 (1977); *United States v. Prout,* 526 F.2d 380, 388–89 (5th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976). The evidence that Miller was unable to identify appellant's photograph went to Miller's credibility and to the in-court identification. Despite the fact of the tardy disclosure, the information was before the jury for their consideration. Furthermore, the evidence of appellant's guilt was substantial. There was testimony that the handwriting on all 61 of the Master Charge tickets was made by the same person, Colyer, and that Colyer's fingerprints were found on 9 of the charge tickets. Further-

more, appellant's mother-in-law had testified that she was visiting in her daughter's house while appellant was away "working in Mexico" and that he returned home bearing some of the same articles as were shown to have been purchased in Mexico by the use of the stolen card. In light of the above, we find the error to be harmless and non-prejudicial.

For the foregoing reasons the judgment is affirmed.