**William NEZOWY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 83–1057.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 14, 1983.

Decided Dec. 21, 1983.

---

John Rogers Carroll (Argued), Carroll & Carroll, Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Chief of Appeals, Elizabeth K. Ainslie (Argued), Asst. U.S. Attys., Philadelphia, Pa., for appellee.

Before ADAMS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

William Nezowy appeals from convictions on three counts of making false statements to the Immigration and Naturalization Service (INS) in violation of 18 U.S.C. § 1001 (1976).[1] 553 F.Supp. 773. Although we conclude that the district court erred in allowing the government to cross-examine a defense witness about invocation of her fifth amendment privilege against self-incrimination, we find this error to be harmless and therefore affirm.

---

1. 18 U.S.C. § 1001 (1976):

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

### I.

Nezowy acted as a self-proclaimed "immigration consultant" on behalf of certain Polish nationals. He was associated with Louis Konowal, an attorney, who represented clients before the INS. Nezowy was fluent in Polish and would often accompany clients to INS interviews as a translator.

The government charged that Nezowy, unbeknownst to Konowal, filed application forms with the INS seeking political asylum for his clients. The clients, it was alleged, were not aware that Nezowy was seeking political asylum on their behalf, and in fact had specifically denied Nezowy permission to make such a claim. After receiving complaints about Nezowy's activities, the INS arranged for an INS official who understood Polish to conduct an applicant interview, with Nezowy present as an interpreter. The INS official testified at trial that Nezowy failed to translate accurately the conversations with his client, deleting all references to "political asylum," and thereby hiding the fact that the client did not wish to apply for such asylum.

The amended indictment charged that Nezowy filed false applications on behalf of Anna Knockowski, Anna Lonczak, Barbara Pas Economopoulos, Bozema Lapinska, Janina Kotowska, and Marian Grech. It also alleged that Nezowy, in violation of 18 U.S.C. § 1422 (1976),[2] collected fees for his services in excess of those permitted by law from all except Lonczak. Nezowy was convicted of filing false applications on behalf of Knochowski, Economopoulos, and Kotowska. He was acquitted on all other counts.

### II.

As a preliminary matter, we observe that, contrary to Nezowy's contention, there was clearly sufficient evidence to support these convictions. At trial, Nezowy admitted that he had filed for asylum for a number of Polish nationals, including Anna Knochkowski, Barbara Pas Economopoulos, Janina Kotowska, and Marian Grech. Yet all testified that they had not authorized Nezowy to do so. Indeed, Anna Knochowski testified that she specifically told Nezowy that she did not want political asylum. App. at 322. Ms. Economopoulos also testified that she told Nezowy that she did not want political asylum. App. at 407–08, as did Ms. Kotowska. App. at 654. This testimony without more is sufficient to sustain a verdict that Nezowy filed political asylum applications without the clients' knowledge or permission, and consequently made false statements to the INS.

### III.

The only issue which requires discussion on this appeal is whether the district court judge erred in allowing the United States Attorney to cross-examine a defense witness about her invocation of the fifth amendment privilege.[3]

### A.

The defense consisted in part of the testimony of Anna Kushnir, Nezowy's part-time secretary. The bulk of Kushnir's testimony concerned the office practices and fiscal and accounting procedures of the Nezowy-Konowal enterprise. Nezowy offered Kushnir's testimony to discredit Konowal's testimony on behalf of the government that he (Konowal) was unaware of Nezowy's activities and that he never derived any fees from them. Kushnir also stated that she was present at a meeting between Nezowy and Marian Grech in which she heard Grech consent to the filing of a political asylum petition. App. at 1185–86. Kushnir testi-

---

2. 18 U.S.C. § 1422 (1976):

Whoever knowingly demands, charges, solicits, collects, or receives, or agrees to charge, solicit, collect, or receive any other additional fees or money in proceedings relating to naturalization or citizenship or the registry of aliens beyond the fees and moneys authorized by law, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

3. Nezowy raised two other issues on appeal. He challenged the sufficiency of the evidence, and he claimed that the trial judge erred in failing to instruct the jury on concealment and authorization. We find no merit in either of these two contentions.

fied further that she was in the room with Nezowy when he had a conversation with Barbara Economopoulos and Ms. Economopoulos' husband. The only arguably relevant portion of that meeting related by Kushnir, however, was when Ms. Economopoulos asked "whether her political asylum application had been withdrawn," to which Nezowy replied: "Yes, it had been right after you made your phone call." App. at 1177. Kushnir acknowledged that she was not a party to the entire conversation but only overheard small fragments of it.

In addition, Kushnir testified that, while appearing before the grand jury as a possible suspect in the investigation, a member of the U.S. Attorney's Office had threatened her with denaturalization and deportation if she did not cooperate in the investigation. App. at 1187. The Government, over Nezowy's objection, sought to rebut the allegation that Kushnir had been so harassed and badgered. It did so by questioning Kushnir about the invocation of her fifth amendment privilege on that day:

Q. Miss Kushnir, did you understand the rights Mr. Finkelstein [the Assistant U.S. Attorney] read to you that day?

A. I was very confused because like I said, he interrogated me before we went in.

Q. Did you understand the rights he read to you that day?

A. Yes.

Q. Did you in fact invoke your Fifth Amendment privilege which he advised you of that day?

A. Yes.

Q. And that was before the same Mr. Finkelstein who had been badgering you.

A. Yes.

App. at 1214. Nezowy contends that this mode of impeachment of a witness was unduly prejudicial and thus should result in a reversal of his conviction.

### B.

■ The general rule, of course, is that the mode of impeachment of a witness is a matter committed to the discretion of the trial court. *E.g., United States v. Cahalane,* 560 F.2d 601 (3d Cir.1977). In *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), however, the Supreme Court held that it was impermissible for the Government to demonstrate that a defendant's testimony was inconsistent by questioning the defendant about his prior invocation of the fifth amendment privilege.

The defendant in *Grunewald* testified at trial in a manner completely consistent with his innocence. The Government then sought to cross-examine him about his prior invocation of the fifth amendment privilege before the grand jury, contending that the defendant's claim of the privilege constituted a prior inconsistent statement. The *Grunewald* Court, however, held that there was no inconsistency between protestations of innocence and invocation of the fifth amendment privilege. The danger that the jury would draw improper inferences from the invocation of the privilege led the Court to conclude that the trial judge had erred in allowing this mode of impeachment.[4]

---

4. The Court stated in part:

We are not unmindful that the question whether a prior statement is sufficiently inconsistent to be allowed to go to the jury on the question of credibility is usually within the discretion of the trial judge. But where such evidentiary matter has grave constitutional overtones, as it does here, we feel justified in exercising this Court's supervisory control to pass on such a question. This is particularly so because in this case the dangers of impermissible use of this evidence far outweighed whatever advantage the Government might have derived from it if properly used. If the jury here followed the judge's instructions, namely, that the plea of the Fifth Amendment was relevant only to credibility, then the weight to be given this evidence was less than negligible, since, as we have outlined above, there was no true inconsistency involved; it could therefore hardly have affected the Government's case seriously to exclude the matter completely. On the other hand, the danger that the jury made impermissible use of the testimony by implicitly equating the plea of the Fifth Amendment with guilt is, in light of contemporary history, far from negligible. Weigh-

The *Grunewald* Court did not go so far as to fashion a blanket rule which would always preclude the admissibility of this form of impeachment. Rather, it chose to pin its decision on the particular facts of *Grunewald* case,[5] but in doing so implied that great caution must be exercised in accepting such testimony.

The government argues, however, that the actual inconsistency reflected in Kushnir's testimony is more sharply drawn in this case than in *Grunewald,* in that Kushnir's invocation of the fifth amendment privilege directly rebuts her claim that she was harassed by the U.S. Attorney during the grand jury investigation. The government contends that Kushnir's claim of privilege is a clear indication that she "was capable of standing up to the government," and therefore the trial cross-examination was proper as a direct contradiction to her claim of harassment. We cannot agree.

The fact that the U.S. Attorney *warned* Kushnir of her fifth amendment rights might perhaps be probative in determining whether he "harassed or badgered" her. Whether Kushnir actually *invoked* the privilege, however, is simply irrelevant to the question of whether she was in fact harassed by the Government. It is every bit as conceivable for a badgered witness to invoke fifth amendment rights out of fear as it is to have a non-badgered witness invoke the right out of confident defiance. The trial cross-examination, therefore, had little relevance in rebutting any assertion that Kushnir had been harassed. Moreover, whether Kushnir was harassed or not was itself merely a tangential issue. Whatever probative value could have been eked out of this testimony is more than outweighed by the potential prejudicial effect of admitting testimony regarding a fifth amendment claim of privilege before a jury. The danger is far from negligible, as the *Grunewald* Court saw it, that "the jury [would make] impermissible use of the testimony by implicitly equating the plea of the Fifth Amendment with guilt...." 353 U.S. at 423–24, 77 S.Ct. at 984. Here, as in *Grunewald,* we find that the balance tilts convincingly toward inadmissibility.

■ Because of the ever present danger that a jury might misunderstand the context in which such fifth amendment questioning occurs, and because such inquiries, invariably challenged at trial and questioned on appeal no matter how well-intentioned, may infect an entire trial which is otherwise free from error, and because we too find it difficult to imagine any circumstance where such examination would be relevant and appropriate, we hold that questioning of a witness by the Government as to whether he had previously claimed the constitutional right to refuse to testify at a grand jury proceeding will constitute trial error, subject only to a harmless error determination.[6]

---

ing these factors, therefore, we feel that we should draw upon our supervisory power over the administration of federal criminal justice in order to rule on the matter. *Grunewald,* 353 U.S. at 423–24, 77 S.Ct. at 983–984.

**5.** Four Justices, headed by Justice Black, would have made the rule absolute. In Justice Black's concurrence, he stated that:

I agree with the Court that use of the claim of constitutional privilege to reflect upon [defendant's] credibility was error, but I do not, like the Court, rest my conclusion on the special circumstances of this case. I can think of no special circumstance that would justify use of a constitutional privilege to discredit or convict a person who asserts it... It seems incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution.
*Id.* at 425–26, 77 S.Ct. at 984–985 (Black, J., concurring).

**6.** Our holding, i.e. that questioning by the government concerning a witness' fifth amendment claim of privilege before a grand jury will constitute trial error, obviously includes a *defendant party* as well as a *non-party witness.* We emphasize, however, that the issue presented in this case involves only the corrective action required when a non-party, such as Kushnir here, is questioned. Thus, contrary to the intimations of the dissent (*see* dissent at p. 1127), we have no occasion to address the adoption of any *per se* rule providing for automatic reversal in the event a defendant himself is questioned by the Government as to his fifth amendment privilege.

### IV.

█ Although we have concluded that the potential for prejudice required that the Government be precluded from questioning Kushnir on the use of her fifth amendment privilege, a careful examination of the record satisfies us that this potential did not crystallize into that degree of prejudice which would compel a reversal of Nezowy's conviction.

In *United States v. Natale*, 526 F.2d 1160 (2d Cir.1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976), the Second Circuit restated its rule on harmless error which is instructive in this situation. There, the court found that error resulting from fifth amendment cross examination was harmless when (1) the witness' testimony was remote from the crime charged, and (2) there was no likelihood that the jury would have become confused and would link the defendant (here Nezowy) to the witness' (here Kushnir's) assertion of the privilege. *Id.* at 1171.[7]

In applying the *Natale* formulation of harmless error here, it first appears that Kushnir's testimony was remote and far removed from the crimes charged regarding Ms. Knochowski and Ms. Kotowska, since Kushnir made no statements directly concerning either alleged victim. Nezowy also claims, however, that the cross-examination discredited Kushnir's testimony, which was generally exculpatory since it tended to show that, contrary to the government's assertion, Nezowy acted with authorization from attorney Konowal. Whether or not Nezowy acted with authorization from Konowal, however, was not related to the actual crime of making a false statement for which Nezowy was charged. If Nezowy in fact made false applications for asylum, then whether Konowal did or did not authorize Nezowy's acts is irrelevant. The dispositive inquiry is whether the *clients* for whom asylum was sought authorized the activity.

Kushnir also testified that she heard Marian Grech give Nezowy permission to file for political asylum on his behalf. Unlike the previously mentioned testimony of "authorization," this evidence is clearly exculpatory. And indeed, it apparently did exculpate Nezowy, for the jury *acquitted* him of that charge, apparently giving full credit

---

At least one other court of appeals subsequent to *Grunewald* has taken the position that, subject to a harmless error determination, questioning about use of the fifth amendment privilege is impermissible in all cases, whether the witness be the defendant or a disinterested third party. *United States v. Natale*, 526 F.2d 1160, 1171 (2d Cir.1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). *See also United States v. Williams*, 464 F.2d 927 (8th Cir.1972); *United States v. Glasser*, 443 F.2d 994, 1005 (2d Cir.1971), *cert. denied*, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971). *Cf. United States v. Lacouture*, 495 F.2d 1237, 1240 (5th Cir.1974), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974); *United States v. Johnson*, 488 F.2d 1206, 1211 (1st Cir.1973); *Bowles v. United States*, 439 F.2d 536 (D.C.Cir.1970), all of which hold that a criminal defendant is not entitled to call a witness for the purpose of having the jury hear him "take the Fifth."

7. In *Natale*, error was found harmless when the witness was asked whether he "testified before a grand jury under immunity." The connection between that question and the implication that the witness had invoked his fifth amendment privilege to refuse to testify was so attenuated,

the court held, that no prejudice could have occurred. *Cf. United States v. Williams*, 464 F.2d 927 (8th Cir.1972), where the Eighth Circuit stated that error could not be harmless when the prosecutor attempted to discredit a "crucial" defense witness. *Id.* at 931. The witness in *Williams* had corroborated defendant's testimony that he [defendant] had given a truthful account of his prior criminal record to a firearms dealer in connection with the purchase of a gun. In *Natale*, a linchpin of the court's holding of harmless error was the Second Circuit's recognition that "the fact that immunity is provided does not always imply that a Fifth Amendment refusal to testify has in fact occurred.... It would be wholly speculative to attribute to these lay jurors an understanding of the reference to immunity *en passant* as anything more than a description of the grand jury procedure." *Natale*, 526 F.2d at 1172.

In the instant case, even if the jury would have recognized from her invocation of the fifth amendment privilege that Kushnir had declined to answer questions before the grand jury, in the unrelated context of the preceding and succeeding questions regarding harassment, the claim of privilege could not have been associated with Nezowy's guilt.

to Kushnir's testimony and rejecting Mr. Grech's own testimony that no such authorization had been given.

The only other statements of Kushnir to which we are directed concern the conversation among Nezowy, Barbara Pas Economopoulos, and Ms. Economopoulos' husband. Whatever testimony Kushnir gave respecting this conversation, however, was of relatively minimal probative value, since both Economopoulos and her husband carried concealed tape recorders at the behest of the INS. It was from these recordings that a transcript of the conversation was prepared. The jury listened to the tape, and, having been furnished with copies of the transcript, read the transcript of the tape as well. Therefore, Kushnir's version of the conversation was superfluous. Moreover, Kushnir admitted that she was not a participant in the conversation and that she had overheard only small portions of it.

It is therefore apparent to us that Kushnir's testimony was either given full credit when exculpatory, or else was so remote from the crimes charged against Nezowy that the first criterion of the Natale rule was fully satisfied. Even in the unlikely event that a jury would credit Kushnir's testimony in one instance but discredit it in another because of her invocation of the fifth amendment privilege before the grand jury, her testimony was at best tangential to the relevant issues in the case, except to the extent that it concerned Marian Grech—the count on which Nezowy was acquitted. Whatever arguable taint at-

tached to her testimony, therefore, could not have worked to the detriment of the defendant Nezowy.

As we have previously observed, the second Natale criterion presents the question of whether a likelihood of confusion would arise in the jury's mind which would link Nezowy to Kushnir's fifth amendment claim. See supra text at p. 1126 and note 7. We find it highly implausible that a jury could have impermissibly imputed Kushnir's invocation of her fifth amendment privilege to Nezowy. The improper cross-examination was a momentary one question exchange in the midst of a nine day trial. Kushnir was a low level employee who worked part-time in a clerical position. There was no suggestion during the trial that she was implicated in Nezowy's scheme. In the words of Judge Oakes writing for the Second Circuit in Natale, "the prosecutor's naughty words were in effect a flyspeck on this record, not a blot." Natale, 526 F.2d at 1172. We therefore conclude that no adverse inferences could have been drawn from this passing exchange which could in any way link Kushnir's invocation of her privilege to Nezowy's guilt.

V.

We are satisfied that no substantial right of the defendant Nezowy was affected by the improper cross-examination of Kushnir.[8] Thus, the cross-examination by the Government, while error, was harmless. See Fed.R.Crim.P. 52. As with the other contentions made on this appeal, see supra

---

8. Judge ADAMS would test Nezowy's conviction by the harmless error standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) (constitutional error must be harmless beyond a reasonable doubt). We point out that both *Chapman* and *Fahy*, fashioning guidelines for determining whether constitutional errors are harmless, involved instances where it was the constitutional rights of the defendant himself that had been violated. *Chapman*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (prosecutor commented on defendant's failure to testify); *Fahy*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (evidence admitted which was seized in violation of defendant's fourth amendment rights). Here,

of course, Nezowy himself was never questioned with respect to any claim of privilege.

Although Judge ADAMS has sought to equate the defendant's standard of harmless error found in *Chapman* with a third party witness, non-defendant standard, we are satisfied that, even if the *Chapman* standard were to apply, a proposition with which we have substantial question, we find that there is no reasonable possibility that the questioning of Kushnir might have contributed to the conviction. *See Fahy*, 375 U.S. at 86–87, 84 S.Ct. at 230–231. Because, even under the *Chapman* standard, the error complained of was harmless, we have no occasion to formulate or discuss a third party witness, non-defendant standard in this case.

note 3, we find this contention of reversible error involving Kushnir's fifth amendment privilege to be without merit as well.

The judgment will be affirmed.

ADAMS, Circuit Judge, dissenting.

The aims of justice are not served by disregarding popular wisdom. Whatever may be the precise legal construction given to the constitutional privilege against self-incrimination, the fact remains that "taking the Fifth" and "refusing to answer" have entered the everyday idiom as synonyms for guilt. Before a jury drawn from the community, the admission of evidence concerning invocation of the privilege at a grand jury hearing is irrelevant, inflammatory and invariably prejudicial.

As I read the majority's opinion, it concedes that evidence concerning a Fifth Amendment claim before a grand jury is inadmissible. Relying on *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the majority first concludes that questioning a defendant about the invocation of this privilege creates an overwhelming presumption of prejudice and therefore cannot be sanctioned. The Court next holds that questioning a non-party defense witness regarding Fifth Amendment claims constitutes a trial impropriety, subject only to a harmless error determination. Applied to the facts of this case, the majority holds that defense witness Anna Kushnir's testimony was either "remote" from the crimes charged or was in any event "given credit" by the jury so that any error committed at trial was harmless.

To the extent the majority would require reversal of a conviction following examination of a defendant about the self-incrimination privilege, I join in that ruling. However, because I have serious reservations about the harmless error rule adopted by the majority in the case of non-party defense witnesses as well as the majority's reading of the record, I respectfully dissent.

## I

The question whether inquiry into the invocation of the Fifth Amendment privilege constitutes prejudicial error is before this Court for the first time. The Second and Eighth Circuits have held that questioning defense witnesses on this point is inappropriate and may require reversal of any ensuing convictions. In *United States v. Williams*, 464 F.2d 927, 930 (8th Cir.1972), the court declared:

> We hold that the prosecutor, through his question and argument relating to [key defense witness] Harris' invocation of the Fifth Amendment, injected prejudicial error requiring reversal.

Similarly, the Second Circuit in *U.S. v. Natale* announced the rule that:

> Where a prosecutor directly asks a defense witness at trial whether the witness refused to answer questions at the grand jury proceedings because the answers might tend to incriminate him, courts have found prejudicial error and reversed the convictions .... Such direct efforts to impeach a defense witness are improper under *Grunewald v. United States*, ... [which] was based on that view that the question prejudiced the credibility of the defendant without sufficiently bearing on the truth of the testimony he had given at trial.

526 F.2d 1160, 1171 (2d Cir.1975). *See also United States v. Glasser*, 443 F.2d 994, 1005 (2d Cir.1971), *cert. denied*, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971).

While categorically rejecting prosecutorial inquiry into Fifth Amendment privilege, *Natale* does not adopt a per se rule of reversing all ensuing convictions. Rather, the Second Circuit would judge such prosecutorial misconduct harmless error if 1) the witness's testimony concerned events remote from the crime charged and 2) there was no likelihood of confusion in the jury's mind between the invocation of the privilege by the witness and the defendant's conduct. 526 F.2d at 1171. The majority opinion in the present case adopts the Second Circuit's *Natale* rule, but then relies upon an expansive view of its harmless error exception.

The *Natale* guidelines do not appear sufficient to guarantee a defendant's right to a trial free of prejudice. The privilege against self-incrimination protected by the Fifth Amendment is, of course, of constitutional magnitude. Its function is "to protect *innocent* [persons]," *Grunewald,* 353 U.S. at 421, 77 S.Ct. at 982, and its invocation is therefore perfectly consistent with innocence. Under either the majority or minority view in *Grunewald,*[1] the line of questioning followed by the Nezowy prosecution has no place in a criminal proceeding. The *Grunewald* Court, however, did not address the possibility of a harmless error exception to its constitutional holding since both the majority and minority agreed that the resulting prejudice required reversal of the convictions.

I am reluctant to accept, as does the majority, that a simple harmless error standard is adequate to protect the defendant's right to a fair trial. Rather, assuming that a per se reversible error rule is not more appropriate, I believe that a strong argument can be advanced for placing upon the prosecution the burden of proving that the error in question was "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). As the Supreme Court declared in *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963).

> The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.

It is true, as the majority points out, that both *Chapman* and *Fahy* involved violation of a defendant's constitutional right. But this distinction between defendants and non-defendants does not settle the question whether the *Chapman/Fahy* standard applies to the present case. Instead, I believe that two independent arguments may be advanced for invoking stricter constitutional standards in cases in which testimony concerning Fifth Amendment privileges is introduced at trial.

First, the majority position provides no reason for distinguishing defendant from non-party witness testimony for constitutional purposes. It is correct as a basic proposition that "[o]rdinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953). This general consideration, however, may be "outweighed by the need to protect ... fundamental rights," *id.* at 257, 73 S.Ct. at 1035, and is therefore not amenable to rigid application. In fact, different standards have been adopted for third party assertion of constitutional rights depending on the nature of the rights themselves. *Compare Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (no vicarious raising of Fourth Amendment rights of others to suppress illegally seized evidence) with *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (civil rights organization permitted to assert First and Fourteenth Amendment rights of its members).

Although a significant body of case law has developed concerning claims by criminal defendants of the Fourth Amendment rights of third parties, *see e.g., United States v. Salvucci,* 448 U.S. 83, 100 S.Ct.

---

1. The *Grunewald* majority found that the prior invocation of the Fifth Amendment could be admitted into evidence only if there were a threshold preliminary inquiry by the trial judge:

   > [P]rior statements may be used to impeach the credibility of a criminal defendant or an ordinary witness. But this can be done only if the judge is satisfied that the prior statements are in fact inconsistent.

   353 U.S. at 418, 77 S.Ct. at 981. Because asserting the privilege is consistent with innocence, *Grunewald* creates a heavy presumption against any cross-examination on this point. In the present case, the trial judge made no preliminary inquiry as required by the *Grunewald* majority.

   Justice Black's concurrence in *Grunewald,* joined by three other Justices, went one step beyond the majority and adopted a per se rule:

   > I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it.

   *Id.* at 425, 77 S.Ct. at 984 (Black, J., concurring).

2547, 65 L.Ed.2d 619 (1980), there is no controlling body of precedent for the Fifth Amendment. What cases do exist turn on combined Fourth and Fifth Amendment claims for the suppression of evidence obtained as a result of interrogations without *Miranda* warnings or trial examinations of non-party witnesses who could have raised the Fifth Amendment privilege. *See, e.g., United States v. Fredericks,* 586 F.2d 470, 480–81 (5th Cir.1978); *United States v. Skolek,* 474 F.2d 582, 585 (10th Cir.1973); *Bryson v. United States,* 419 F.2d 695, 698 (D.C.Cir.1969). These decisions are not applicable to the case at bar since our concern is not with the evidentiary fruits of potentially privileged testimony but the infection of the trial process itself by the extraneous interjection of prejudicial testimony concerning the invocation of the

Fifth Amendment.[2] The sole case addressing this precise point, *United States v. Colyer,* 571 F.2d 941, 946 (5th Cir.1978) *cert. denied,* 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed.2d 328 (1978), assumes the applicability of the *Chapman* standard without further discussion.

As I see it, the question whether the prosecution's cross-examination of Kushnir necessitates the stricter standard of protection given to constitutional error is closely akin to the question of third-party standing. Under the case law governing jus tertii, a litigant may assert constitutional claims other than his or her own when the same act, "both injures [the litigant] and impinges upon the constitutional rights of third persons."[3] By analogy, a criminal defendant may properly assert a third party con-

---

**2.** It must be emphasized that the introduction of Kushnir's prior invocation of the Fifth Amendment was not inadvertent. The matter was raised at side bar and resolved as follows:

> [U.S. Attorney] MS. SPEARING: Your Honor, I would like to inquire into [Kushnir's] taking the Fifth Amendment in the grand jury as to whether or not she answered truthfully in the grand jury . . . .
>
> Your Honor, if we could go back to the reason we asked for the side bar because we wanted to ask Miss Kushnir whether she answered questions or whether she in fact invoked her Fifth Amendment privilege so as to show she understood the advice and so on [U.S. Attorney] Mr. Finkelstein was giving her and is perfectly capable of standing up to the Government, contrary to the implication, and I simply did not want to create reversible error by somehow bringing out any evidence with respect to Fifth Amendment privilege in an improper context. I don't believe that it's improper, but I would like the Court to rule on that.
>
> [Defense Attorney] MR. CARABELLO: It's my contention at this point—and what I intend to do so we can get a ruling immediately is, according to the ruling that you made, your Honor, concerning the testimony that she would—
>
> THE COURT: How does that impeach her credibility?
>
> MR. CARABELLO: Number one, I asked her—
>
> THE COURT: I know what you asked her. How does what she has been asked so far impeach her credibility? . . . .
>
> All right, the thing that's before me now is whether the Government can go on and read to her the testimony to bring out by question-

ing that she invoked her Fifth Amendment privileges and I think the better way to do it, rather than to read it from the statement, would be to ask her and I will permit the Government to ask her that question.

> MRS. AINSLIE: Fine.
>
> MR. CARABELLO: Note my objection.
>
> THE COURT: Why are you objecting?
>
> MR. CARABELLO: I think it's prejudicial, your Honor.

App. 1209–13.

**3.** Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L.Rev. 423, 424 (1974). While the standing issue usually arises in bringing a controversy to court (as in First Amendment overbreadth cases), this Note ably analyzes the doctrinal confusion surrounding third-party claims:

> The patchwork of exceptions, based upon considerations of questionable force and relevance, seems to indicate both dissatisfaction with the presumption against assertion and a lack of coherent doctrine to guide the court in adjudicating jus tertii claims. A practice of permitting claimants to assert jus tertii when the injury of which they complain also deprives third parties of constitutional rights is necessary to ensure that such rights are fully protected. Such a practice would inject a greater degree of candor and consistency into Court decisions than is engendered by a rule most often honored in the breach. Finally, the suggested practice would permit the Court to turn its attention in jus tertii cases to the substantive constitutional claims presented without the risk of confusing the merits with procedural questions of standing.

*Id.* at 443.

stitutional claim, and therefore fall within the ambit of the stricter *Chapman* standard, if the constitutional claim raised is valid and·trial error is committed. Under these circumstances, the validity of a constitutional claim would be governed by this Court's two-part test set forth in *Bowman v. Wilson*, 672 F.2d 1145, 1152–53 (3d Cir. 1982):

> For a person who himself can allege injury in fact to be permitted to assert the constitutional rights of another, thereby seeking redress of both his own injury and that of the third party, two requirements must be satisfied. First, not only must there be a close relationship between the litigant and the person whose right he is asserting, but the activity the litigant proposes to pursue must be inextricably bound up with the constitutional right of the person from whom the right is drawn. *See Singleton v. Wulff*, 428 U.S. 106, 114–15 [96 S.Ct. 2868, 2874–2875, 49 L.Ed.2d 826] (1976) (plurality). Second, there must exist some obstacle to the third party asserting his or her own rights. *Id.* at 115–16 [96 S.Ct. at 2874–2875]. If both requirements are met, a party who is injured by the conduct of another but is not the beneficiary of the constitutional right proscribing that conduct can nonetheless complain of that injury by asserting the right of the injured third party.

(footnotes omitted). It would appear that Nezowy's assertion of Kushnir's Fifth Amendment privilege satisfies both prongs of the Bowman inquiry.

A second, independent basis for applying the *Chapman/Fahy* standard is found not in the Fifth Amendment, but in the Sixth. Under the Sixth Amendment, a defendant must be able to confront witnesses or to introduce testimony to rebut evidence or inferences that could lead to a conviction. Allowing inquiry into a defense witness's assertion of the self-incrimination privilege effectively deprives a criminal defendant of these Sixth Amendment rights. An inference of guilt cannot be rebutted since the witness may not be forced to explain the basis for having invoked the Fifth Amend-

ment or to dispel the implications of guilt. *See Brink's, Inc. v. City of New York*, 717 F.2d 700, 716 (2d Cir., 1983) (Winter, J., dissenting). Thus, the prosecution's .questioning of Kushnir infringed upon important Sixth Amendment rights *of the defendant himself.* Regardless of whether Nezowy can assert a third party claim, this infringement of the Sixth Amendment independently provides him standing and would therefore appear to require application of the *Chapman* harmless beyond a reasonable doubt test.

If we were to apply the *Chapman* test, Nezowy's conviction could not withstand scrutiny. As this Court previously held in *United States ex rel. Macon v. Yeager,* 476 F.2d 613, 616 (3d Cir.1973), a conviction cannot be sustained when critical portions of the evidence are disputed and the case is not so overwhelming that the Court can conclude beyond a reasonable doubt that the constitutional error did not contribute to the conviction. I do not, however, reach the ultimate question of the application of the *Chapman* standard because an analysis of the record establishes that even under the majority's harmless error test a new trial is required.

## II

Nezowy was charged with falsifying asylum applications for six Polish nationals. He was convicted on three of the eleven counts. On its face, this division between convictions and acquittals suggests that witness credibility and detailed factual inquiries were of significance. The majority contends that the testimony of key defense witness Kushnir was "remote and far removed," at 1125, from the crimes charged. I cannot agree.

Kushnir testified that she was a business associate of Nezowy from 1972–78. She stated that she participated in interviews with Polish nationals seeking asylum while she was working as a paralegal and secretary with Nezowy and his associate, attorney Louis Konowal. App. at 1175. Ms. Kushnir further testified that she is fluent

in Polish and was fully able to follow the conversations regarding the applications for altered immigration status. App. at 1180–81. She gave general exculpatory testimony concerning the business practices of Nezowy based upon her having been a party to a number of the allegedly criminal transactions. Moreover, she gave specific testimony regarding the events surrounding the asylum applications of Pas and Grech; Nezowy was charged with having falsified both applications.

While Nezowy was acquitted on the charge of falsifying Grech's application, he was convicted on a similar charge with regard to Pas. The majority opinion seeks to minimize the value of Kushnir's testimony concerning what transpired with Pas. The record, however, reveals that Kushnir was familiar with Pas's file and that she testified that Pas had applied for asylum prior to meeting with Nezowy. App. at 1175–76. She further testified that Pas's first meeting was with Konowal, not Nezowy, and that at the one meeting she attended where Nezowy was present with Pas, Nezowy declared that Pas's asylum application had been withdrawn pursuant to her request. App. at 1174–77. Were the jury to have believed Kushnir regarding Pas's immigration application, Nezowy could not have been convicted of falsifying her asylum request.

The record thus demonstrates that Kushnir was indeed a critical defense witness. Her close business association with Nezowy, in particular her attendance at meetings which Nezowy had with some of the Polish nationals, also establishes that she was a likely participant of the activities referred to in the indictments. Under these circumstances, I am unable to say that the jury could not have imputed wrongdoing to Nezowy as a result of having been informed of Kushnir's Fifth Amendment plea.

### III

For the foregoing reasons, I respectfully dissent.